MAYOR AND CITY COUNCIL OF BALTIMORE *v.*
HAROLD Y. SMULYAN ET AL.

[No. 509, September Term, 1978.]

*Decided January 12, 1979.*

The cause was argued before MELVIN, LISS and WILNER,
JJ.

*T. Thornton Murray* and *Richard K. Jacobsen, Assistant City Solicitors for Baltimore City,* with whom were *Benjamin L. Brown, City Solicitor,* and *Ambrose T. Hartman, Deputy Solicitor,* on the brief, for appellant.

*Arnold M. Weiner,* with whom were *Joseph S. Kaufman, Glenn E. Bushel* and *Melnicove, Kaufman & Weiner, P.A.* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court.

This is a condemnation case. It involves property in downtown Baltimore that is now part of the front lawn of the new Federal Courthouse, and, until Baltimore City condemned it in December, 1972, belonged to Harold Smulyan.

The real issue in the case, of course, is how much Mr. Smulyan should be paid for his property: what was its fair market value on December 4, 1972? The City's appraisers testified that the fair market value on that date was between $400,000 and $420,000 — one said $400,000, the other said $420,000. Mr. Smulyan's experts, not unexpectedly, thought the property was worth considerably more — one said $745,880, the other said $840,000. The jury topped them all; it set the value at $895,104 and returned a verdict upon inquisition in that amount.

The City, appealing, claims that this grievous error occurred because the jury was permitted to hear evidence of what it termed a "re-use" appraisal made by one of the City's experts — Leslie Wilson — that was irrelevant and prejudicial, and that the trial court erred both in allowing such evidence to be admitted and in failing to instruct the jury to disregard it. The City frames the questions presented in its appeal in very broad terms — much broader than is necessary. What is really before us are these three questions, all of which are very closely interrelated:

(1) Did the court err in admitting testimony and exhibits relating to a 1971 appraisal made by one of its expert witnesses — Leslie Wilson?

(2) Did the court err in its instructions to the jury with respect to that appraisal?

(3) Was the evidence sufficient to support the jury's verdict?

The context in which these questions — particularly the first two — arose was a dispute between the City and Smulyan over what the "highest and best use" of the property was as of the date it was taken. At that time, the property was being used as a parking lot. It was part of a square block consisting mostly of old multi-story loft buildings used for light manufacturing or wholesale trade enterprises. The City's position, espoused through its expert, Mr. Wilson, was that the highest and best use of the property was its then current actual use — a parking lot. Smulyan, on the other hand, considered the City's position to be somewhat myopic, and therefore unrealistic. Through his appraisers, he looked around to the extensive redevelopment effort that had been going on in downtown Baltimore for some two decades, adjudged that his property and the block of which it was a part was next in line for major renewal and redevelopment, and thus believed that the highest and best use for the property was a high-rise office building.

This dispute over "highest and best use", so pivotal to the respective values placed upon the property, constituted the setting from which the legal issues arose. To comprehend that setting however, one must know as well some of the geography of downtown Baltimore, the nature and history of urban redevelopment in that part of the City, and how that redevelopment came to affect this property. We have attached as an appendix to this Opinion a copy of a map of downtown Baltimore that was admitted as an exhibit in the case, and have delineated and marked on it the relevant boundaries and landmarks. It will serve as a convenient reference document for the descriptions that follow.

There were three major urban renewal projects that had some bearing on the Smulyan property. These were:

(1) Charles Center, involving a 33-acre tract bounded by Saratoga Street on the north, Charles Street on the east,

Lombard Street on the south, and Liberty Street and Hopkins Place on the west. This project — the earliest of the three — was planned in the 1950's and built in the 1960's and 1970's, beginning at the northern end and moving south. On the southernmost border — the north side of Lombard Street — is the new Federal Office Building (labeled by us "FOB" on the Appendix) and Charles Center South, a high-rise office building at the northwest corner of Charles and Lombard Streets. By the time of the taking here, most of Charles Center, including the Federal Office Building, had been completed.

According to Martin Millspaugh, a witness for the City who was deeply involved in the planning and coordination of much of the overall redevelopment, Charles Center was intended "to lead the way . . . and to stimulate additional development of the same kind in the downtown area", and it clearly had that effect. Paralleling the development of Charles Center itself, there was extensive private redevelopment on its eastern fringe, resulting in the construction of at least five additional high-rise buildings just outside the perimeter of Charles Center.[1]

(2) Inner Harbor One. While Charles Center was yet in its infancy, a second, even more ambitious, project was on the drawing board — redevelopment of the City's inner harbor area. This is a much larger area lying to the south and southeast of Charles Center, and plans for it were broken into two projects — Inner Harbor One and Inner Harbor West.

The planning for Inner Harbor One started in earnest in the early and mid-1960's. This project encompassed the land area east of Charles Street, south of Lombard Street, and north of Key Highway, thus enclosing the inner harbor basin located to the southeast of Charles Center. By 1972, according to Mr. Millspaugh, most of the redevelopment sites in this area had been sold to developers, and demolition of existing structures on those sites was about 75% complete. One large

---

1. These were the Blaustein Building, the Arlington Federal Building, the Chesapeake and Potomac Telephone Co. Building, the W.R. Grace Building, and the First Maryland Building, all being on the east side of Charles Street between Lombard and Saratoga Streets.

new structure — the U.S.F. & G. Building — had been "topped off", and plans were under way for the new IBM Building.

(3) Inner Harbor West — the second phase of the overall inner harbor redevelopment — was officially authorized in March, 1971. It encompassed the area directly west of Inner Harbor One and directly south of Charles Center, being bounded on the north by Lombard Street, on the east by Charles Street, on the south by Hughes Street, and on the west by Sharp Street and Hopkins Place.

The Smulyan property lay within the Inner Harbor West area. It was part of a square block (which we shall call the "Courthouse block") bounded by Lombard Street on the north, Hanover Street on the east, Pratt Street on the south, and Sharp Street on the west. The Smulyan property itself consisted of three contiguous lots known as 106-114 South Hanover Street. It fronted for 126 feet on the west side of Hanover Street, commencing about 60 feet south of Lombard Street, and extended westerly for a depth of 148 feet to an alley known as Sutton Street. Altogether the property comprised 18,648 square feet.

Most of the evidence pertaining to the overall redevelopment effort in downtown Baltimore came from Mr. Millspaugh, the City's lead-off witness. The essence of it, as indicated above, was that, by 1972, extensive redevelopment — both in terms of official urban renewal projects as well as private activity on the fringes of these projects — had either been completed or was well under way to the north and the east of the Smulyan property, some of it coming within a block or two.[2]

In the course of his testimony, Mr. Millspaugh identified and discussed a number of urban renewal plans — official, semi-official, and non-official — that had been proposed over the years for Baltimore's central business district, and that

---

[2]. Mr. Millspaugh also mentioned briefly the City's then current effort, which never came to fruition, to interest the Chessie System Railroad in redeveloping the Camden railway yard and station, lying two blocks to the west of the "Courthouse block."

encompassed as well the Smulyan property and the area immediately surrounding it.[3] Each of these plans or proposals projected or recommended that the "Courthouse block" in general, or the Smulyan property in particular, would or should be developed for high-rise office use. Mr. Millspaugh concluded this part of his testimony by acknowledging that he knew of no proposal made by any public or private consultant during the preceding one or two decade period "that recommended anything other than high-rise development" for that block.

As noted, the Smulyan property lay within the bounds of the Inner Harbor West development project, and the City's plans did not call for a Federal Courthouse there. In April, 1969, however, the City learned that a Congressional Committee had authorized construction of a new Federal courthouse in the City, and that the General Services Administration (GSA) would soon begin searching for a suitable site. Working with some City officials, a GSA evaluation team examined 22 potential sites, and ultimately picked the "Courthouse block." On November 16, 1970, the Mayor concurred in that choice, and advised GSA that "we stand ready to assist you in any way we can (including the use of our local condemnation powers, if necessary) in acquiring the recommended site."

GSA, initially, showed no interest in having the City involved in the acquisition, but rather proceeded on its own. As soon as the necessary appropriation was forthcoming from Congress, GSA began contacting the various property owners in the block. On January 8, 1971 Smulyan received a letter from GSA advising him that "a portion" of the

---

3. These were the Central Business District Study (CBD) prepared in 1959 by the Planning Council of the Greater Baltimore Committee, Inc. (GBC), a 1964 study done for the Planning Council by Morton Hoffman, a market consultant periodically employed by the City; and a Metro Center Study, prepared in 1970 by the City Planning Commission. The first of these — CBD — stated, in part, that "[a] major change from the present distribution of office space is the proposed expansion of the Office District south of Lombard to Pratt Street, between Howard St. and Light St." The Metro Center Study, and a 1965 GBC publication entitled "The Inner Harbor & City Hall Plaza" each depict the "Courthouse block" as being improved in the future by new high-rise buildings.

"Courthouse block" had been selected as the site for a new Federal courthouse, subject to satisfactory subsoil tests. The owner was asked to sign a "Right of Entry" form giving GSA permission to enter the property for purposes of "subsoil tests, appraisal and survey", and was advised that "[w]e would expect the appraisal to be completed within approximately 60 days, after which time you will be contacted by a representative of this office in order to discuss the purchase of your property."

Notwithstanding that, at the time, the City had no condemnation authority over this area — the ordinance granting such authority (No. 1007) not being enacted until March 15, 1971 — the City nevertheless attempted to persuade GSA to permit the City to acquire the property on its behalf rather than for GSA to make the acquisition directly.[4] The City's first two proposals in this regard were rejected by GSA, but on May 10, 1971, the City put forth a third proposal — to acquire the entire block and sell GSA what it needed for the courthouse at "fair market value." In connection with this proposal, Millspaugh authorized the employment of Leslie S. Wilson, Jr., and Charles F. Seymour, both M.A.I. appraisers, to prepare a report on the "fair value" of Development Area 4-A (see Footnote 4). Mr. Wilson's understanding was that the appraisal report was to be made "under development allowed by the Baltimore City Zoning Ordinance and Building Codes *without any renewal or development Standards and Controls.*" (Emphasis supplied.) He said, in his letter accepting the employment,

"We are sure you must realize the great latitude this allows relative to highest and best use. This necessitates our analyzing the complete downtown Baltimore Market in order to arrive at a conclusion

4. The "Courthouse block" contained about 150,000 square feet, of which only 102,250 were needed for the courthouse itself. The City, however, wanted to make certain that the entire block would be acquired in order to assure that the balance of the block could be redeveloped in conjunction with the Federal project. It therefore split the block into two separate "development areas". Area 4-A consisted of the 102,250 square feet needed for the courthouse, and Area 4-B consisted of the balance, some 45,000 square feet.

regarding highest and best use. It will then be necessary for us to determine in our opinion *the intensity of this probable development as indicated by the market. From this we will be able to estimate the value of the subject site based upon the usual appraisal processes including comparable sales and an income check."* (Emphasis supplied.)

On June 22, 1971, Wilson and Seymour delivered their "preliminary estimate" to the City. Reciting again that the value is to reflect "an open market sale of this site" with development restricted only by building and zoning codes, they concluded that the "highest and best private use" of this site would be for the construction of "speculative office space, automobile garage parking and related facilities", that in view of the size of the property (102,250 square feet) development would "have to be staged", and that "a reasonable price for the sale of this property at this time would be not less than $3,100,000 nor more than $3,275,000."

On July 1, 1971, the City sent a proposed "Letter of Understanding" to GSA. This letter called for the City to acquire Area 4-A, clear it, and then to convey the property to the Government "at its *fair market value* which is estimated to be no less than $3,100,000 and no more than $3,275,000." (Emphasis supplied.) The letter made clear that the actual "fair market value", and thus the ultimate price, "will be based on an independent appraisal prepared by a member or members of the Appraisal Institute" subject to the approval of GSA and the City.

This proposal was initially rejected by GSA, but the snag that apparently led to that rejection was soon resolved. On August 11, 1971, Millspaugh authorized Wilson and Seymour to "proceed with the preparation of your final report on the fair value of Development Area 4a . . ." and, on August 16, the City renewed its offer to acquire Area 4-A and sell it to the Government "for an estimated $3.1 million", noting again that this was a preliminary estimate of "fair market value" and that the "final determination of value" would be incorporated in the appraisal report of the "team of

independent real estate appraisers" that had made the preliminary estimate.

On August 27, 1971, the final appraisal — the document that generated the issues raised in this appeal — was delivered. It valued the land in Area 4-A, for its highest and best use as of August 24, 1971, at $3,238,000, or $31.65 per square foot.

Wilson and Seymour stated that the "highest and best use" for Area 4-A was office building construction which, because Baltimore had not been plagued with "overbuilding" like some other cities, was a use that "is reasonable and can be achieved." However, because of the large size of the total area, they believed that the market would not be able to absorb the immediate full development of the entire 102,250 square feet; so they divided the area into three equal-sized parcels — A, B, and C — each containing 34,083 square feet, and valued each parcel separately.

The purpose of the appraisal, they said, was to estimate "the fair value" of Area 4-A, "as if cleared of buildings and available for use under certain conditions and assumptions as of the current date." The term "fair value", as used in the report, was defined as "the price which a well informed buyer acting intelligently, voluntarily and without necessity would be warranted in paying and a well informed seller acting intelligently, voluntarily and without necessity would be warranted in accepting for the property." Also in explanation of the "purpose" of the appraisal, they noted:

> "The only restrictions regarding the use of Area No. 4-A are those imposed by Zoning Ordinance and Building Codes of Baltimore City.[5] We have been advised that this is the only lot within the Inner Harbor West Project which will not be limited by redevelopment Standards and Controls. All lots in Charles Center were subject to Urban Renewal type restrictions as will those contained in the Inner Harbor I Project."

---

5. The appraisers considered this to be significant. "This lack of usual standards and controls", they said, "allows complete flexibility in our determination of the highest and best use of this property."

As stated in their letter accepting the employment, Wilson and Seymour used both a "comparable sale" and a "land residual or income check" approach in determining the fair value. They rejected sales within the confines of Charles Center or Inner Harbor One because of the urban renewal restrictions on those sites, which made the land sale prices too low to be comparable.[6] Instead, they considered six other sales, *all for private high-rise development,* which they deemed "significant".

Wilson and Seymour made no attempt in the appraisal report to locate the boundaries of their hypothetical Parcels A, B, and C within the perimeter of Area 4-A, although in his deposition, which he affirmed from the witness stand, Wilson described Parcel A as beginning at the corner of Lombard and Hanover, and extending 211 feet on Hanover Street and 161 feet on Lombard Street. *It thus included the Smulyan property, which comprised about 55% of the total area of Parcel A.* The highest and best use of Parcel A, the appraisers said, "[a]s of the effective date of this appraisal", was as "the site for the construction of a multi-tenant high-rise office building comprising a net rentable area of 350,000 square feet and an above ground automobile parking garage to accommodate 150 automobiles." Parcel B was considered for the "same development" as Parcel A, but five years hence. Parcel C, they said, would be developed in 10 years in a similar way but with a smaller structure — 150,000 square feet of office space and parking for 75 cars. During the interim, Parcels B and C could be used for parking lots.

Because the development of these parcels had to be "staged", each was given a different value. Parcel A was valued at $1,622,250, which worked out to $48/square foot. Parcel B was valued at $1,007,255, which worked out to $29.55/square foot, and Parcel C was valued at $269,850, or

---

6. Seymour explained in his testimony that, because of set-back and other use restrictions applicable in urban renewal areas, only about 50% (and sometimes even less) of the square foot land area could be productively developed. This had a depressing effect on value or price. But, in appraising Area 4-A, they were not governed by urban renewal restrictions — only the zoning and building codes. Thus, a far greater percentage of the land area could be productively developed, thereby enhancing the value of such relatively unrestricted land.

$7.92/square foot. Additional values of $129,208 and $209,440 were added to Parcels B and C, respectively, to take account of interim uses pending development; and that brought the grand total to $3,238,000, or $31.65 per square foot.

Copies of this appraisal report were sent to GSA on October 8, 1971.[7] GSA responded that it needed additional data with respect to total acquisition costs of the "Courthouse block", which the City asked Wilson to provide. On December 13, 1971, Wilson responded with his estimate that the cost to GSA, if it decided to assemble the block itself, would be $3,793,410, of which $3,169,675 would be for "Site Acquisition", $248,735 for site clearance, $350,000 for relocation expenses, and $25,000 for appraisal and title reports. On top of this, Wilson added 5% for "probable jury awards over appraised values" and court costs, making a gross estimated cost of $3,983,080. Even this gross figure did not include, he said, additional costs sure to be added if GSA, which either did not have or would not exercise "quick take" powers, had to wait any appreciable time to complete the acquisition. The site acquisition cost, Wilson noted, was based upon an appraisal he had made of the block in February, 1970, at which time he estimated the acquisition cost to be $2,881,525. To this, he added an inflation factor of 10%, or $288,150, to make the $3,169,175.

Following this, by letter of January 24, 1972, the City formally offered to sell Area 4-A to GSA for the appraised value of $3,238,000. GSA thus had before it the City's firm offer to sell the land, cleared for construction, for $3,238,000 and Wilson's estimate that if GSA proceeded on its own to acquire the properties, the cost would likely be at least $760,000 more. A month later, GSA accepted the City's offer.

This was the background of the City's condemnation of Mr. Smulyan's property in December, 1972. By the time of trial,

---

7. On September 15, 1971, GSA advised the City that, in accordance with then current Federal regulations, "the value of the property may not exceed '*the fair market value of the property as of the base period based on sales of similar or like property.*'" (Emphasis supplied.) The "base period" was stated to be July 16, 1971 through August 14, 1971. The copy of the appraisal report sent to GSA reflected that requirement, which resulted in no change in the estimated value.

the whole of Area 4-A had, of course, been sold to the Government at the agreed price of $3,238,000.[8]

The chief appraisal witness for the City in the condemnation case was the same Leslie Wilson. He stated that he was commissioned by the City to appraise the Smulyan property in January, 1970. At that time, the property consisted of a parking lot and was surrounded by older four and five story buildings. The appraisal that he made in 1970, he said, was based upon a comparison with "other lands in the neighborhood that had sold" and a capitalization of his estimate of "the rental I thought the property should receive from a parking structure." In 1972, he brought the 1970 appraisal "up to date".

In both instances, Wilson said, the highest and best use for the property was for a parking lot. In making this determination, he said that he ignored completely anything pertaining to the Inner Harbor West project, and looked only at the uses to which the property, and the property immediately surrounding it, were then put. To ascertain value, Wilson said that he examined "as many properties that had sold in the, I say reasonable past, in the vicinity of the subject property." He considered the location and characteristics of these other properties in relation to the Smulyan property "in order to arrive at the answer, of what I felt the answer would be for the value of the subject property based on these other sales that took place."

Mr. Wilson thereupon listed seven sales which he deemed to be comparable, and which he considered in estimating the fair market value of the Smulyan property in 1970 and 1972. None of the six "significant" sales referred to in the 1971 appraisal was considered as "comparable" for purposes of the 1970/72 appraisal, and only one of the seven sales that were considered involved land purchased for high-rise development. The rest were either much smaller lots than Smulyan's or were lots located several blocks to the west, in the retail shopping district where there was little or no high-rise office development.

---

8. The actual contract was signed on July 26, 1973, and a deed followed sometime in September, 1973.

Based upon the seven "comparable" sales, and allowing for inflation since they occurred, Wilson estimated the value of the Smulyan property as $21/square foot, or $391,508, which he rounded off to $400,000.

Having concluded, for purposes of *this* appraisal, that the highest and best use of the property was as a parking lot, Wilson's "income approach" to valuation was to estimate "the rental I thought the property should receive from a parking structure." He figured that the lot should produce a return of $1.80/square foot, or $33,566 annually. Deducting 5% for vacancies, the net return, he said, would be $31,800 which, capitalized at 8%, produced a value of $398,600. Again, he rounded this off to $400,000 which was his final estimate of value.

The City noted its first objection to evidence pertaining to the *1971* appraisal during the testimony of Mr. Millspaugh. It then asked for a "blanket" objection to "any mention" of what it termed "the re-use appraisal" on the basis that Millspaugh was not an appraiser (and thus presumably incompetent to testify as to the appraisal) and because "it's improper to be using this particular re-use appraisal in a case on acquisition." At that point, Smulyan proffered to the court that the 1971 appraisal was admissible both for purposes of cross-examining Mr. Wilson when he testified, in that it contained statements and conclusions inconsistent with what his trial testimony would be, and also as substantive evidence upon the theory that the City had "adopted" the appraisal in its dealings with GSA, thus making it an "admission" by the City as to value. After some discussion, the court, in effect, sustained the City's objection to the point of not allowing Millspaugh to testify about the appraisal. The clear import of the court's ruling at that point was that the 1971 appraisal was not admissible as substantive evidence of value; and Millspaugh thereafter did no more than identify various letters and documents relating, directly or indirectly, to the appraisal, without mentioning any conclusions or opinions stated in the appraisal report.

The question next arose during the cross-examination of Wilson. The City then renewed its objection on the basis that

the 1971 appraisal was "an entirely different ball game and entirely different piece of property" — that it was made for a different purpose and upon different assumptions. Though unarticulated, the basis of the objection was that of relevance. Smulyan again asserted that evidence pertaining to this appraisal was admissible on essentially the same grounds argued earlier. The court reviewed the 1971 appraisal in chambers, and then concluded:

> "I am not prepared to rule, in fact I don't rule that this appraisal is absolutely inadmissible. I think it's not a question of admissibility but a question of weight to be afforded it under proper instructions to the Jury at the appropriate time, and I'm going to overrule the objection because, as I just said, I think it is a proper area for cross-examination."

Following this ruling, Wilson was cross-examined in great detail about the differences between the two appraisals. After some hesitation, he finally located Parcel A on a map and acknowledged that Smulyan's property comprised about 55% of it. He acknowledged further that under the very liberal zoning applicable to Smulyan's property in 1972, a high-rise building containing 259,000 square feet could have been constructed on it. And he was cross-examined with respect to those sales he believed were "significant" in 1971, those he felt were "comparable" in 1972, and why they differed. On re-direct examination, Mr. Wilson attempted to explain the differences between a "re-use" appraisal and an "acquisition" appraisal.

Following Mr. Wilson, Phillip E. Klein, another M.A.I. appraiser, was called by the City. He too appraised Smulyan's property in 1970, updating his appraisal in July, 1972. In contrast to Mr. Wilson, Klein stated that the highest and best use for the property was "as an *assemblage* with an *interim use* for parking." (Emphasis supplied.) Nonetheless, by considering five sales which he deemed to be comparable, only two of which were considered by Wilson in his 1970/72 appraisal, he essentially concurred with the valuation made

by Wilson. Klein said that Smulyan's property was worth $420,000.

The City concluded its case by calling Charles F. Seymour, Wilson's collaborator in the 1971 appraisal, to testify about the differences between a "re-use" and an "acquisition" appraisal. Seymour was not asked about the actual content of the 1971 appraisal on direct examination. On cross-examination, he acknowledged that because Area 4-A — the property appraised in 1971 — had no Urban Renewal standards or controls on it, to that extent it differed from all other "re-use" appraisals he had done. A "re-use" appraisal, he said, usually assumes urban renewal land use controls. It differed also, he admitted, in that normally in a "re-use" appraisal, there are "insufficient, inadequate, and uncomparable comparables in the market data approach", whereas in this instance there were "sufficient and adequate comparables."

Smulyan's case may be quickly summarized. Smulyan testified that he purchased the first of the three contiguous lots (110-114 South Hanover) in 1955 to house his clothing business. After retiring from that business in 1958 following a heart attack, he purchased the other two lots (108 and 106 South Hanover) in 1962 and 1965, respectively. His intention, he said, was to hold the property for development or to create a larger parcel of land. He stated that he had spoken with neighboring owners in an effort to purchase additional property and was told, in effect, that if they ever decided to sell, they would let him know. In answer to the court's question of whether he had any plan for the "ultimate usage" of this property, he said that his goal was to put a high-rise building on the land — the more land he could assemble, the more "impressive" the building could be — but that he had enough at that point to put "a beautiful highrise building on it."

Finally, Carl Heinmuller and Bernard Manekin, both qualified experts, gave their opinions as to value. Both believed that the highest and best use of the property was for a high-rise office building, and both reached that conclusion, and their conclusion as to value, by looking at all of the

massive redevelopment going on around the subject property. The essence of their testimony was that Smulyan's property, with its extremely liberal zoning, had become strategically situated, and was simply in the path of the converging downtown renewal.

At the conclusion of the case, the court defined (correctly and without objection) what "fair market value" meant. It noted that there had been "diversions of testimony" as to what the highest and best use of the property was, and that it was up to the jury to make that determination. If the jury believed that the highest and best use was as part of an assemblage with other property that Smulyan "might have reasonably been able to assemble", the jury could consider any increase in value resulting from such assemblage. They might consider also any enhancement in value by reason of the proximity of the property to "the development of other public projects such as the Charles Center Project and the Inner Harbor One Project or any private development within this area", but they were instructed *not* to consider any enhancement in value attributable to the Inner Harbor West project.

Finally, the court referred to the two appraisals done by Mr. Wilson, and told the jury:

"Now, these appraisals then were for two different reasons and you must keep that in mind; one solely for the condemnation of the subject property, the other for the use of the whole block in connection with the negotiations with the Federal Government in a proposed sale to the Federal Government by the City of the whole block, but for whatever substance that this evidence may be to you, in weighing the voluminous testimony in this case regarding property values in the area, the immediate, the general area with which we are concerned in this case, you may, and I'm not saying you must, but you may, if you see fit to do so, you may consider the similarities or the dissimilarities in the factors which were used by the City appraiser in the reuse and in

the acquisition appraisal. I say that you may use these similar or dissimilar factors solely for the purpose of judging the weight or the value or the credibility of the ultimate opinion which the City appraisers gave as to the fair market value of this property in this condemnation proceeding; but you cannot use any reuse appraisal in order to enhance the value of this subject property because I've told you, and I hesitate to repeat it, but I should repeat it again in this context, you cannot use any enhancement which was brought about by the project itself in which the subject property is located."

The City's first complaint, as noted, was that the court erred in permitting the jury to hear any evidence pertaining to Wilson and Seymour's 1971 "re-use" appraisal. Smulyan counters, preliminarily, that the City failed to preserve its objection (1) by failing to object to the cross and re-cross examination of Wilson or to the actual admission of the 1971 appraisal report and documents pertaining to it, and (2) by examining Seymour about the appraisal, and failing to object to the cross-examination of Seymour. As to this, we believe that the record as a whole shows that the objection was preserved.

The City objected, and indeed asked for a "blanket objection", to "any mention of the re-use appraisal" when the subject first arose during Mr. Millspaugh's testimony. It won that first skirmish when the court precluded Millspaugh from discussing the appraisal and declined to admit into evidence at that point the various letters and documents pertaining to the appraisal. The City again made a timely objection when defense counsel indicated his intention to begin cross-examination of Mr. Wilson about the 1971 appraisal, and left no doubt that its objection remained a general one. It believed that the 1971 appraisal was irrelevant and should not be brought into the case. When the court permitted cross-examination of Wilson to proceed, however, it decided the issue raised by the City's objection; and, by failing to

object to each further question or exhibit, the City was simply acquiescing in the court's ruling rather than manifesting a waiver of its twice-stated objection.

We do not, and, of course, may not, depart from the oft-stated rule that an objection to evidence may be deemed waived if the same evidence is permitted to come in subsequently without objection. *See, for example, State Roads Comm. v. Bare,* 220 Md. 91 (1959). However, there are some practical limits to what counsel must do, or refrain from doing, in order to preserve the objection. When a party makes a clear objection to specific evidence and that objection is plainly overruled, he is not required to play the ostrich and simply ignore the evidence, or its potential effect upon his case, for fear of losing his ground for appeal. He may cross-examine (or, in this instance, re-directly examine) the witness about the evidence, *Peisner v. State,* 236 Md. 137, 144 (1964), and make other reasonable efforts to show that the evidence, admitted over his objection, should nevertheless be discounted or disregarded by the trier of fact. This is all that the City did in this case, and it is quite different from soliciting (or failing to object to) the independent reception of the same evidence, from which a waiver may be implied.

The problem, for the City, was not that its objection was waived, but rather that the court's ruling on it was correct.

Nichols (5 Nichols on Eminent Domain, § 18.45(2) (3rd ed., 1969)) states generally that "[t]he scope of cross-examination of experts and other witnesses who have testified to value in land damage cases is very broad, since cross-examination is often the only protection of the opposing party against the unwarranted estimates that a certain class of mercenary experts is wont to indulge in." In that context, Nichols goes on to say:

> "He [the expert] may be questioned as to his appraisals of other property in the area which he has made, but only if a foundation has been laid for comparison of the different tracts appraised. Cross-examination of the expert as to other appraisals made by him of neighboring land made at

a time which is not too remote is permissible. And, of course, he may be examined with respect to an earlier appraisal which he made of the subject property."

These statements are fairly reflective of what the courts have held. The Idaho court observed in *State ex rel. Symms v. Cole Fire Protection District,* 451 P. 2d 1011, 1012 (Idaho, 1969):

"Absent an opportunity to show that an expert witness is not really qualified, one of the few ways an opposing party has to question his credibility, other than by mere contradictory testimony of other witnesses, is to show the witness has made other apparently inconsistent appraisals of similar property in the approximate area and within a proximate period of time. The witness at that time or on redirect examination has every opportunity to temper such other appraisal or appraisals and convince the jury they are not inconsistent. But the opposing party has every right to raise the spectre of inconsistencies and to attempt to impeach the witness thereby."

*See also Board of Cty. Comm'rs v. H. A. Nottingham & Sons, Inc.,* 540 P. 2d 1126 (Col. App., 1975); *Board of Education v. 14.098 Acres of Land, Etc.,* 251 A. 2d 835 (Del. Super., 1969); *Atlantic Refining Co. v. Director of Public Works,* 233 A. 2d 423 (R.I., 1967); *City of Renton v. Scott Pacific Terminal, Inc.,* 512 P. 2d 1137 (Wash. App., 1973); *City of Garland v. Stevener,* 462 S.W.2d 67 (Tex. Civ. App., 1970); *People v. Murata,* 326 P. 2d 947 (Cal. App., 1958); *Langston v. City of Miami Beach,* 242 So. 2d 481 (Fla. App., 1971). *Also State Roads Comm. v. Wyvill,* 244 Md. 163 (1966).

The City characterizes the 1971 appraisal as a "re-use" appraisal, and, as though there is some magic significance to such an appraisal, asserts that, because it is a "re-use" appraisal, it is thereby *ipso facto* irrelevant in an acquisition case. Neither the law in general nor the record in this case supports that approach, however.

Mr. Wilson and Mr. Seymour each attempted to define a "re-use" appraisal, and each gave a somewhat different definition. It is not entirely clear, therefore (from this record, at least), just what a "re-use" appraisal really is. Wilson said that a "re-use" appraisal "takes into consideration" the urban renewal plan that is applicable to the property, whereas an "acquisition" appraisal may not take into account any increase or decrease in value attributable to the public project itself. Seymour stated that a "re-use" appraisal is an estimate of the value of property "which has been subjected to the Urban Renewal Process" — *i.e.,* with the property assembled, existing improvements demolished, and streets widened or closed in accordance with the renewal plan. "It's an estimate", he said, "of the value of that assembled property, usually subject to extensive standards and controls which run with the land for the life of the Urban Renewal Program."

Assuming, *arguendo,* that Wilson and Seymour were expressing the same concept, the common denominator of that concept was that a "re-use" appraisal considers and values property as though it were subject to all of the conditions, restrictions, and controls imposed by the urban renewal plan. The record, however, does not establish, either as a matter of law or as an irrefutable matter of fact, that their 1971 appraisal fell within the bounds of that concept. In sharp contrast to their testimonial definitions, the appraisal report itself, as well as the exchange of letters authorizing the appraisal, makes clear that the value was estimated *without regard* to urban renewal conditions, controls, or restrictions. Moreover, whereas Wilson, in his testimony, defined the term "fair market value" for purposes of a "re-use appraisal" as taking into consideration the urban renewal plan itself, the term is not defined that way in the appraisal report.

Labels, in this instance, are unimportant, meaningless. Calling the appraisal a "re-use" appraisal, whether or not it is one, does not and cannot change the nature of the appraisal itself. It purported to be an estimate of the fair value of a 102,250 square foot tract of land, 18,648 square feet of which was the very property under consideration in this case. The

appraisal was based upon certain assumptions and conclusions as to "highest and best" use and as to what nearby sales were "comparable" that differed significantly from the same types of assumptions made a year earlier and a year later by the same appraiser. Certainly, the City had every right to argue the validity and reasonableness of these differences to the jury, and to suggest that the 1971 appraisal be disregarded. But, as the Idaho court said in *State ex rel. Symms, supra,* "the opposing party has every right to raise the spectre of inconsistencies and to attempt to impeach the witness thereby." That, if nothing else, made the appraisal report and the cross-examination concerning it admissible.[9]

The City next argues that the court erred in instructing the jury "that they could consider the re-use appraisal in their deliberations." That misstates the instruction. The jury was told that "you cannot use any reuse appraisal in order to enhance the value of this subject property", but that it might use the similarities and dissimilarities between the two appraisals "solely for the purpose of judging the weight or the value or the credibility of the ultimate opinion which the City appraisers gave as to the fair market value of this property in this condemnation proceeding. . . ." In short, the instruction was fully consonant with the court's evidentiary ruling, and was entirely correct and appropriate.

Finally, the City asserts that the jury's verdict was unsupported by the evidence. Pointing out that all of the experts opined as to lower values, the City postulates that what the jury did was to accept the $48.00/square foot value placed on Parcel A by the 1971 "re-use" appraisal, multiply that unit value by the 18,648 square feet in Smulyan's property, and thereby arrive at its $895,104 verdict.

The jury is not bound to accept the opinion of any one, or all, of the experts in arriving at its verdict, but "is free to apply its independent judgment as to the weight of any facts before it." *Greater Balto. Con. Mkt. A. v. Duvall,* 255 Md. 90, 97 (1969); *Bergeman v. State Roads Comm.,* 218 Md. 137

---

9. Smulyan, for obvious reasons, has not cross-appealed, and thus the question of whether the court erred in rejecting the 1971 appraisal as substantive evidence of value is not before us.

(1958). The jury viewed the site, and could see for itself all of the development going on around it. That view, though not sufficient by itself to support a verdict, is substantive evidence. *Bergeman, supra,* at page 142. In addition to the view, there was testimony from Messrs. Wilson and Heinmuller as to the price of the assemblage at 27-31 South Charles Street, a block and a half away from Smulyan's property, upon which the First Maryland Building was constructed. Wilson stated that this site was about the same size as Smulyan's, and sold in 1969 for $58.38/square foot, including demolition. Inflation at the rate of 5% a year, Wilson said, would add an additional $8.75/square foot, making the comparable price over $67/square foot. Mr. Heinmuller believed the sale itself to be a comparable one; and, if the jury accepted that belief, as it had a right to do, that would suffice to support its verdict.

The jury was entitled to discredit the whole approach put forward by the City's appraisers and it obviously did so. In light of Mr. Millspaugh's testimony, especially when coupled with that of Messrs. Heinmuller and Manekin, it was entitled to believe that the highest and best use of Smulyan's property was for a high-rise office building, and not for a parking lot. And it was entitled to believe that his property was therefore worth far more than the $20-$30/square foot brought by properties to the south and west, more even than the $40/square foot Mr. Heinmuller described with respect to an assemblage occurring directly across the street, but less than the $67/square foot brought by the First Maryland Building assemblage. In summary, although the jury may well have done precisely what the City alleges, there was sufficient independent evidence to justify the verdict of $48/square foot; and that is all that counts.

> *Judgment affirmed; Mayor and City Council of Baltimore to pay the costs.*