# MAYOR AND CITY COUNCIL OF BALTIMORE
## v. KELSO CORPORATION ET AL.

[No. 1584, September Term, 1979.]

*Decided July 11, 1980.*

The cause was argued before GILBERT, C. J., and LOWE, J., and JACOB S. LEVIN, Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Richard K. Jacobsen, Chief Solicitor,* with whom was *Benjamin L. Brown, City Solicitor,* on the brief, for appellant.

*Jonathan A. Azrael,* with whom were *Edward Azrael* and *Azrael & Gann* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

This appeal is the sequel to *City of Baltimore v. Kelso Corp.,* 281 Md. 514, 380 A.2d 216 (1977) (*Kelso I*).

The English had a word for the report of the real estate appraiser hired by the Mayor and City Council of Baltimore (City) in this condemnation case. That word was *floccinaucinihilipilification.*[1] It means the habit of estimating things as worthless or of belittling the achievements of others.

A jury in the Court of Common Pleas, presided over by Judge Albert L. Sklar, displayed its disagreement with the City's evaluation of land and improvements thereon, formerly owned by the Kelso Corporation, *et alia*[2] (Kelso) and which had been subject to a "quick take" by the City. For details of the "quick take," *see Kelso I, supra.* Notwithstanding the City's appraisal of $78,291 as the value of the Kelso property that had been condemned, the jury, after hearing the evidence and the other evaluations found, by their verdict, the fair market value of Kelso's property to be $261,275, a sum that is approximately three and one-half times that offered by the City to Kelso.

---

**1.** S.K. Sperling, *Poplollies and Bellibones, A Celebration of Lost Words* 98 (1977). The term was coined by linking together four words from an Eton Latin grammar book. The four words are *flocci-nauci-nihili-pili* and adding "fication."

**2.** Other appellees are Wilmer Court, Inc. and Arnold and Eva Cohen. We, for purpose of clarity and simplicity shall refer to all appellees as "Kelso."

Patently miffed by what it perceives to be unwarranted generosity on the part of its citizens-jurors, the City has brought its lamentation to this Court wherein they seek to reverse the judgment. The City has propounded three questions for our consideration, namely:

"I. Did the lower court commit reversible error by permitting testimony relating to the re-use appraisal of certain lots which was prepared at the City's request in conjunction with its plan for the Orchard-Biddle Project and in anticipation of selling said lots to G.S.A.?

II. Did the lower court commit reversible error when it instructed the jury that it could compare the re-use appraisal with the City's acquisition appraisal?

III. Did the lower court commit reversible error by refusing to allow the City to question Kelso about the amount of its 'investment'?"

So that the reader will have a better understanding of our discussion of each of the three questions, we shall set forth a resume of the facts giving rise to this case.

## — THE FACTS —

The seeds of this controversy were sown more than seven years ago, when the City, commencing in October 1972, and continuing through May 1973, filed eight separate petitions of condemnation against Kelso.[3] The subject of the condemnation consisted of a number of properties, totalling 52,255 square feet. All were located in Baltimore City in the area bounded by Sarah Ann Street to the north, Saratoga Street to the south, Pine Street to the west, and Pearl Street to the east.

---

**3.** The docket entries disclose that by order of the court, dated October 25, 1973, the cases were consolidated, and by agreement, only one inquisition was to be rendered for all the parcels that involved Kelso and the others named in n. 2, *supra.*

The properties have been consolidated with others and now form a part of the Department of Health, Education & Welfare's recently constructed Social Security Administration complex.

Initially and ostensibly, the Kelso land was sought by the City for use in its proposed "Renewal Plan for the Orchard-Biddle Neighborhood Development Program Urban Renewal Area." Baltimore City Ordinance No. 1175 (Nov. 15, 1971).

Battle was joined when Kelso moved to dismiss the City's petitions to condemn the Kelso holdings. The appellee alleged that the City, "with malice aforethought," had rezoned the subject properties from Second Commercial to Residential, see Baltimore City Ordinance No. 1051 (April 20, 1971), thus depressing the market value. Kelso theorized that the City, after acquiring the property at an advantageous price, planned to rezone the property for commercial use, and then to sell it at a substantial profit to the Federal government for the construction of the Social Security Complex.[4] The trial court, following a hearing, agreed with Kelso and dismissed the petition to condemn.

The matter wended its way to the Court of Appeals after by-passing this Court. That forum, in *Kelso I, supra,* reversed the trial court, holding that inasmuch as Kelso had not challenged either the right or the authority of the City to exercise its power of eminent domain, the petition should not have been dismissed. *Kelso I* was remanded to the trial court where *Kelso II* came into being.[5]

Trial in the matter *sub judice* commenced on September 5, 1979.

Phillip E. Klein, a real estate appraiser, testified for the City that the neighborhood, immediately adjacent to the

---

4. Kelso was a reasonably good prognosticator. The property was rezoned by Baltimore City Ordinance No. 774 (Dec. 17, 1974) to commercial usage and was sold to the Federal government so that the Social Security Complex could be built thereon.

5. The Court of Appeals pointed out that Kelso should be permitted to demonstrate, if possible, that the City, through fraud, had depressed the value of the property.

Kelso tracts, consisted of "a blighted area, a lot of vacant land, a lot of buildings not being used and partially vandalized." The appraiser viewed the "highest and best use for the subject property" to be an "assemblage for residential development." Klein valued the parcels at $86,950 in fee, which, after payment of the underlying ground rents, resulted in the net figure of $78,291, or approximately $1.50 per square foot.

The City put Klein's "condemnation appraisal" into evidence. It consisted of a single page table, listing the properties, their size, and a brief computation of the appraised value.

To what appears to be the consternation of the City and Mr. Klein, Kelso's counsel was then permitted to inquire about a "re-use appraisal," which Klein prepared only two months *after* the "condemnation appraisal."

The "re-use appraisal" was intended by the City to be presented to the General Services Administration (G.S.A.) as part of the City's successful effort to convince that federal agency of the desirability of locating the Social Security expansion in Baltimore City instead of Baltimore County.

The area of the property embraced in the "re-use appraisal" ranged in size from 515,577 square feet to 693,551 square feet.[6] All the Kelso property was included in the re-use appraisal.

In stark contrast to the paucity of information contained in the "condemnation appraisal," the "re-use appraisal" comprised seventy-four pages. Compared to Klein's direct testimony, the "re-use appraisal," it is fair to say, was significant for its stress of the advantageousness of the geographical location of the area in which the Kelso land and that of others was situated. Klein, therein, cited the close proximity of the State Office Building Complex, the University of Maryland at Baltimore, the "central business district," including "restaurants, and centers of

---

6. The appraisal was in reality an appraisal of three different sized tracts, so that G.S.A. had some flexibility in selecting the size of the Social Security facility.

entertainment and culture, the financial district, ...
Charles Center," hotels and motels, as well as the Maryland
General Hospital. Accessibility to the property by both
public or private transportation was described as
"excellent." [7] According to the re-use appraisal, the "highest
and best use of the subject property is for office building and
uses ancillary thereto." Klein, in response to the questioning
of Kelso's attorney told the jury that in his report, he valued
the tract at approximately $8.00 per square foot, a price per
square foot of over four times his evaluation of the Kelso
land.[8]

Kelso's counsel drew from Klein the admission that each
of his statements regarding the larger tract was equally
applicable to the Kelso parcels standing alone. Klein
explained to the jury the differences in the appraisal. He
said:

> "The reason ... [for the difference] is because
> there were two — the two different interpretations
> and elements of emphasis were appropriate.
>
> In one instance, I was dealing with a 50 to 52,000
> square foot site within — as it existed without the
> project. Then I attributed the highest and best use
> as for residential development or possibly at no
> more value, second commercial development, with a
> small warehouse.

---

**7.** Klein's report detailed the present bus routes servicing the area and
noted that the proposed subway included plans for a station within several
blocks of the subject property. Klein also pointed out that both the
Greyhound bus terminal and the Pennsylvania Railroad Station were
located nearby. The re-use appraisal detailed the streets, both present and
future, by which the property could be reached.

**8.** In the "reuse appraisal" Klein opined that "as of May 1, 1973, the
value in re-use of the subject property under the three potential plans of
disposition are as follows:

| | |
|---|---|
| Plan No. 1 [(515,577 sq. ft.)] | $4,050,000 in fee simple [or $7.86 per sq. ft.] |
| Plan No. 2 [(610,127 sq. ft.)] | $4,950,000 in fee simple [or $8.11 per sq. ft.] |
| Plan No. 3 [(693,551 sq. ft.)] | $5,800,000 in fee simple [or $8.36 per sq. ft.]" |

Now, within the confines of that appropriate appraisal, means of appraisal, and within the confines of the legislative definition, the characteristics of the neighborhood as relate to the benefits of this residential development of one hundred units were to a small commercial development which is one thing. Then we get into an appraisal of a twelve to sixteen acre site, instead of a one and a half acre site, we get into a reuse appraisal of an area where the central core has all been eradicated. There has been a new area completed.

I am looking at a site now where its contemplated use is regional in nature, with multi-thousand or multi-million square foot facility, where thousands of employees will be coming and going and visitors each day.

So that the relationship of that facility, and its utility for the purpose, has an identity with the State Office Building, which is also a governmental facility eight miles away, and has an identity with the cultural and recreational and the financial center of the city. And the subway and the arterial highways become much more important and a more material factor in evaluating this 12.6 acre site cleared of the slums where thousands of people are going to come and go every day. Then it becomes a matter of importance in respect to an appraising a parcel without the benefit — not entitled to the benefit of the project, and a parcel of land a tenth or more or less in size and surrounded by the dilapidated facilities which are proximate to it."

The City, *via* its attorney, sought to elicit from Dr. Saul Moses, a stockholder and the Secretary-Treasurer of Kelso, the price Kelso had paid for the parcels of land. Judge Sklar refused to allow the evidence to be heard by the jury because the sales had occurred more than five years prior to the condemnation and "the mass transit Metro Rapid Line . . .

the station at Lexington Market, . . . [and the] extension of Lexington Market" among other changes, foreclosed a fair comparison of the sales. The trial judge did permit the City, however, to question Dr. Moses about one lot inasmuch as that particular lot had been purchased within five years from the date of the "quick take."

As we have said, the jury returned a verdict in the amount of $261,275, or $5 per square foot.[9]

## — THE LAW —

The City strenuously objects to Judge Sklar's permitting the appellee to interrogate Mr. Klein about the "re-use appraisal." While not specifically articulated by the City, the legal basis of the exception seems to be that of relevance. The City avers that Md. Real Property Code Ann. (1974) § 12-105 (b) forbids the inclusion within "fair market value" of "any increment in value proximately caused by the public project for which the property condemned is needed." The City reasons that the re-use appraisal was "directly related to the Orchard-Biddle Project" and "was influenced by the project" so that the document was "inadmissible as a matter of law."

We observe that the Real Property Art. § 12-105 is not a rule of evidence and does not operate so as to circumscribe the scope of cross-examination.

The City's argument ignores our recent decision in *City of Baltimore v. Smulyan,* 41 Md. App. 202, 397 A.2d 198 (1979), *cert. denied,* 285 Md. 728 (1979). The facts in *Smulyan* are almost identical to those in the matter now before us. The City condemned Smulyan's land in order to sell it to the Federal government as a situs for the Garmatz Federal Courthouse. At the inquisition, Smulyan was permitted to utilize a similar "re-use appraisal" in order to cross-examine the City's experts.

The City appealed, contending, as it does now, that the

---

**9.** Appellee's expert testified that in his view, the parcels were worth $323,700, or approximately $6.20 per square foot. Obviously, the jury did not totally accept either expert's appraisal.

appraisal was irrelevant. Judge Wilner, for the Court, reviewed the authorities [10] and observed that the scope of cross-examination of experts in land acquisition cases is extremely broad. *See also Miller v. State Roads Commission,* 37 Md. App. 583, 378 A.2d 686 (1977). Rejecting the City's contention that "a re-use appraisal is *ipso facto* irrelevant," Judge Wilner wrote:

> "Labels, in this instance, are unimportant, meaningless. Calling the appraisal a 're-use' appraisal, whether or not it is one, does not and cannot change the nature of the appraisal itself. *It purported to be an estimate of the fair value of a 102,250 square foot tract of land, 18,648 square feet of which was the very property under consideration in this case. The appraisal was based upon certain assumptions and conclusions as to 'highest and best' use and as to what nearby sales were 'comparable' that differed significantly from the same types of assumptions made a year earlier and a year later by the same appraiser. Certainly, the City had every right to argue the validity and reasonableness of these differences to the jury, and to suggest that the 1971 appraisal be disregarded.* But, as the Idaho court said in *State ex rel. Symms [v. Cole Fire Protection District], supra* [at 811, 451 P.2d at 1012], 'the opposing party has every right to raise the spectre of inconsistencies and to attempt to impeach the witness thereby.' That, if nothing else, made the appraisal report and the cross-examination concerning it admissible." 41 Md. App. at 221-22, 397 A.2d at 209. (Emphasis supplied.)

We think what we said in *Smulyan* to be dispositive of the issue in the instant case. Moreover, in *Kelso I,* the Court of Appeals, speaking through Judge Digges, by way of dicta,

---

**10.** *See, e.g.,* Nichols, *Eminent Domain* § 18.45 (2) (3rd ed. 1969); State ex rel. Symms v. Cole Fire Protection District, 92 Ida. 810, 451 P.2d 1011 (1969).

strongly suggested that on retrial, even if Kelso was unable "to establish a fraudulent intent [on the part of the City] to depress the value of the [Kelso] property, it will still be entitled to show, if it can, the probability that the land would be rezoned within a reasonable time after the condemnation, as well as evidence as to the effect of such a probability upon the property's value at the time of the taking." (Citations omitted.) 281 Md. at 520, 380 A.2d at 220.

It appears to us that Judge Sklar did no more than allow Kelso to accept the strong invitation of the Court of Appeals to explore that area that the City seeks to conceal.

We perceive no error in Judge Sklar's permitting Kelso to inquire of the City's expert, Klein, as to the content of the "re-use appraisal."

## II.

The City's second argument is also unavailing. The appellant avers that the trial judge invited the jury to "consider the 'similarities and dissimilarities' between the re-use appraisal and the acquisition appraisal." The City contends that instruction was "clearly" reversible error.

What seems to be so clear to the City eludes our vision. Perhaps that is because we must, in reviewing the instruction of the trial judge, look at the complete charge, as a whole, and not selectively examine individual statements which, out of context, appear misleading or improper. *Dean v. Redmiles,* 280 Md. 137, 374 A.2d 329 (1977). We have in part stated that "[a] jury instruction, 'like a piece of tapestry, is made up of many strands which interwoven make a pattern; to separate a single one and look at it alone, not only destroys the whole, but gives the strand itself a false value.'" *Burko v. State,* 19 Md. App. 645, 661-62, 313 A.2d 864, 873 (1974), quoting Judge Learned Hand, *Proceedings in Memory of Mr. Justice Brandeis,* 317 U.S. XI (1942). Judge Sklar, the record indicates, told the jury:

"[Y]ou may use a similar or dissimilar factor [in the re-use appraisal] *solely for the purpose of judging*

*the weight or the value of the credibility* of the ultimate opinion which the City appraiser gave as to the fair market value of the property in this condemnation proceeding, *but you cannot use any of the reuse appraisal or the new use appraisal, in order to enhance the value of the subject property, which was brought about by the Orchard-Biddle Project* itself in which the subject property is located." (Emphasis supplied.)

Moreover, in two other instances in the same charge, the trial judge instructed the jury that they were not to consider any enhancement in value caused by the public project for which the land was condemned.

The City, in *Smulyan, supra,* made the same challenge it now makes here. A virtually identical instruction in that case, we concluded, "was fully consonant with the court's evidentiary ruling and was entirely correct and appropriate." *Smulyan, supra,* 41 Md. App. at 222, 397 A.2d at 209. The City's argument relative to the instruction is lacking in merit.

## III.

Lastly, the appellant asserts that Judge Sklar erred in refusing to permit the Assistant City Solicitor to cross-examine Dr. Moses regarding Kelso's investment in the subject properties. The City believes that those transactions should have been admitted as "comparable sales." Appellant suggests that Judge Sklar forestalled the cross-examination simply because the sales took place five years prior to the act of condemnation and, accordingly, abused his discretion.

If the record bore out appellant's view of the judge's basis for his ruling, the contention might be pregnant with merit. Our review of Judge Sklar's ruling, however, indicates to us that the judge prohibited the cross-examination not only because of the elapsed time, but also because of the improvement made in the area surrounding Kelso's land during the intervening period.

A trial court has wide discretion in determining what sales, if any, are reasonably comparable. *Bergeman v. State Roads Commission,* 218 Md. 137, 145, 146 A.2d 48, 53 (1958); *Lustine v. State Roads Commission,* 217 Md. 274, 280, 142 A.2d 566, 568 (1958); *Patterson v. City of Baltimore,* 127 Md. 233, 241, 96 A. 458, 461 (1915). The Court, in *City of Baltimore v. Schreiber,* 243 Md. 546, 551, 221 A.2d 663, 665-66 (1966), declared:

> "There are a myriad of circumstances to be considered in each case in determining if the time the purchase price was paid was too remote to have any probative value in aiding the jury's ascertainment of present fair market value. Such circumstances include: degree of change in the condition of the property, changes in the condition of the surrounding property or in the character of the neighborhood, economic growth in the area, etc." (Citations omitted.)

Whenever there is a question in the trial judge's mind as to the relevance of a particular sale or sales, the better practice is to admit the evidence, and leave the weight to be accorded it to the jury, *City of Baltimore v. Schreiber, supra; Lustine v. State Roads Commission, supra.* There is, however, no "hard and fast standard" as to either the admission or exclusion of such evidence. *Belworth, Inc. v. City of Baltimore,* 256 Md. 369, 374, 260 A.2d 284, 287 (1970).

We perceive no abuse of discretion by Judge Sklar, who observed that there was significant improvement in the surrounding neighborhood between the time of purchase by Kelso and the City's taking *via* condemnation of the Kelso property.

Moreover, we note that a number of the properties were purchased by Kelso at tax sales. Such transactions do not ordinarily establish "fair market value," inasmuch as they are "forced sales" and not voluntary in nature. Under the circumstances of this case, the evidence as to the purchase price paid at a tax sale is irrelevant. It could tend to confuse

the jury and might work an injustice to Kelso. Thus, even if there were no significant changes in the neighborhood, we would still affirm Judge Sklar's ruling as to the admission of the tax sale information.

*Judgment affirmed.*
*Costs to be paid by appellant.*