660 A.2d 970

**Gayle Ann SCHREIBER**

**v.**

**CHERRY HILL CONSTRUCTION COMPANY, INC.**

**No. 1516, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

June 29, 1995.

---

12.  The State argues that the judge is presumed to know what he was signing.

464

Janet M. Truhe (Ward, Janofsky & Truhe, P.A.), Towson, and E. Suzan Miller, Westminster, for appellant.

Geoffrey S. Gavett (Rhoda S. Barish, Gavett and Datt, P.C., on the brief), Rockville, for appellee.

Argued before MOYLAN, BISHOP, and SALMON, JJ.

BISHOP, Judge.

Appellee, Gayle Ann Schreiber ("Schreiber"), filed a five-count complaint and two amended complaints in the Circuit Court for Baltimore County against Pamela K. Benton ("Benton"), Johnson, Mirmiran & Thompson, P.A. ("JMT"), and appellant, Cherry Hill Construction, Inc. ("Cherry Hill"). In her second-amended complaint, Schreiber sought damages resulting from injuries she sustained while performing her duties as a Maryland State Trooper. Schreiber alleged that, while she was investigating an automobile accident at a road construction site monitored and supervised by JMT and Cherry Hill, Benton's car struck her, throwing her approximately sixty feet. Schreiber avers in her complaint that Benton drove in a careless and negligent manner (Count I), that JMT breached its duty to monitor and inspect the construction site in a prudent and safe manner (Count II), that Cherry Hill breached its duty to engineer, design, supervise, and monitor the construction site in a safe and prudent manner (Count III), that JMT was grossly negligent and blatantly disregarded the dangerous condition of the construction site (Count IV), and that Cherry Hill was grossly negligent and blatantly disregarded the dangerous condition of the construction site (Count V).

In addition to the complaint filed by Schreiber, JMT filed a third-party complaint against Earth Engineering Sciences,

Inc. ("EESI"), an inspection firm that supplied employees to JMT on a subcontractor basis. JMT also filed cross-claims against Cherry Hill and Benton. Cherry Hill filed cross-claims against Benton, JMT, and EESI, and Benton filed cross-claims against JMT and Cherry Hill. Schreiber, however, settled with Benton, JMT, and EESI prior to trial; therefore, Benton, JMT, and EESI are not parties to this appeal.

Cherry Hill filed a motion to dismiss Schreiber's claim for punitive damages, and a motion for summary judgment. The trial court denied both of these motions. Prior to submitting the case to the jury, however, the trial court granted Cherry Hill's motion to dismiss the punitive damages claim.

The jury returned a verdict in favor of Schreiber on her negligence claim against Cherry Hill and found that JMT and EESI negligently performed their inspection services. The jury awarded Schreiber $22,989.83 in stipulated medical expenses, $100,000 for lost wages/earning capacity, and $50,000 for pain and suffering. The trial court entered judgment in favor of Cherry Hill on its cross-claims against Benton, JMT, and EESI.

Schreiber filed a motion for judgment notwithstanding the verdict and/or new trial, as to damages only, contending that the jury's verdict was tainted by the admission of certain evidence. The trial court denied the motion.

## Issues

Schreiber raises five issues on appeal, and Cherry Hill raises two issues on cross-appeal. For clarity and convenience, we shall address Cherry Hill's issues first.

### Cherry Hill's Issues:

I. Whether Schreiber's claims are barred by the Fireman's Rule?

II. Whether the trial court erred in refusing to instruct the jury on active/passive negligence.

Schreiber's Issues:

III. Did the trial court err when it admitted evidence of Schreiber's receipt of disability pension benefits where there was no evidence of malingering?

IV. Did the trial court err when it admitted evidence that Schreiber should be required to obtain a graduate degree to enhance her wage-earning potential and mitigate her damages?

V. Did the trial court err in allowing Cherry Hill's vocational rehabilitation expert to testify concerning the existence of higher paying jobs which he thought may be available to Schreiber?

VI. Should Schreiber's claim for punitive damages have been submitted to the jury?

VII. Did the trial court err when it denied Schreiber's motion for judgment notwithstanding the verdict as to the liability of JMT and ESSI?

*Facts*

On the afternoon of July 4, 1989, Schreiber responded to the scene of a motor vehicle accident on eastbound I–695 in Anne Arundel County. The accident occurred in the right, eastbound lane of I–695, just past the Route 3 exit ramp. Trooper Leroy Truitt, who arrived on the scene before Schreiber, had set up a flare line to provide a zone of safety for rescue personnel. Benton, who was travelling in the right, eastbound lane of I–695, approached the accident scene, saw the flares, and tried to slow her vehicle and move to the left lane; however, she lost control of her car, which caromed off a jersey barrier, crossed the two eastbound traffic lanes, and struck Schreiber. When Benton's vehicle struck Schreiber, Schreiber was within the safety zone established by Trooper Truitt. Schreiber was thrown sixty feet and sustained a closed head injury, contusions to the head, two black eyes, a contusion to the left elbow, a hematoma to the left buttock, a separated shoulder, a sprained left ankle, and a left tibia fracture that extended into her kneecap.

The evidence showed that, prior to the accident, Benton had been driving for approximately one year. Benton's license had a restriction requiring that she use a driving knob because extensive brain surgery, which she had undergone as a child, left her unable to control her vehicle at all with her left arm. The Motor Vehicle Accident Report indicated that, on the day of Schreiber's accident, it was raining, and that, prior to Benton's losing control of her vehicle, she was driving fifty-five miles per hour, the posted speed limit. Additionally, the Motor Vehicle Accident Report revealed that Benton was "under medication for seizures."

When Schreiber's accident occurred, Cherry Hill, a contractor hired by the State Highway Administration ("SHA"), was building the I–97/I–695 Interchange. Schreiber's accident occurred along the second curve of a reverse "S" curve, constructed by Cherry Hill as a temporary crossover, which took eastbound traffic past the Route 3 exit ramp and joined it with westbound traffic. The entire road project, including the temporary crossover, was to conform with design plans prepared by the Greiner Engineering Company ("Greiner"). Cherry Hill's contract with the SHA required preparation of an alternative plan for any construction that did not conform to Greiner's design plans and submission of the alternative plan for review and approval by the State Traffic Engineer, Larry Elliott. Construction of any area of the roadway could not proceed without prior approval by the State Traffic Engineer.

According to Schreiber, the reverse "S" curve, where her accident occurred, did not conform to Greiner's design plans, because those plans did not provide for any curves, and therefore, Cherry Hill did not have an approved alternative plan for the construction of the reverse "S" curve. Schreiber's expert witness, Andrew E. Ramisch, testified concerning the design of the "S" curve:

[Mr. Ramisch]: In this particular case the radius of the curve was 135 feet on the curve where Ms. Schreiber was hit. The 42 degree curve that I talked about is a little bit different measurement. In highway engineering a cord

[sic], which is a straight line, to a point on a curve is struck. Where that curve is one hundred feet long the angle subtended by the one hundred foot curve was measured, in this case it was 42 degrees. For a gentle curve like this for a interstate standard the same cord of one hundred feet gives a much, much smaller angle. I believe it is something like three degrees. So. radius and angle are interrelated as are radius and other factors, but the sharper the radius, the more of a kink it is. It is a quick, abrupt curve. That's the best that I can explain it.

Q: And this curve was 135 feet and 42 degrees?

[Mr. Ramisch]: Yes.

Q: And design standards dictated by AASHTO would have dictated what type of radius for a 55 mile per hour speed?

[Mr. Ramisch]: I believe I calculated it out to 1600 and some feet.

Q: Which would be what in degrees?

[Mr. Ramisch]: Three degrees.

According to a mathematical formula, which gives the design speed for any given radius, the design speed for a forty-two degree "S" curve is thirty miles per hour. Additionally, Schreiber asserted that the curve was banked improperly and that there were no advance warning signs. According to Cherry Hill, however, "[t]he undisputed evidence at trial established that significant site considerations limited the manner in which Cherry Hill could configure the geometrics of the crossover." Cherry Hill also maintained that signs could not be posted and the speed limit could not be changed without the express direction and approval of the State.

Cherry Hill conceded that its contract with the SHA required it to post appropriate signs, in accordance with the Manual on Uniform Traffic Control Devices, on all roadways under its construction. Also, Cherry Hill conceded that it had a duty to set and keep the jersey barriers in proper alignment. Schreiber argued that the jersey barriers along the reverse "S" curve were constantly misaligned, and therefore, any vehicle that struck a misaligned barrier, inevitably, would be

deflected across the roadway, in the same manner as was Benton's vehicle.

Schreiber maintained, at trial, that Cherry Hill knew of, but ignored, the safety hazards that the forty-two degree, reverse "S" curve posed to motorists. Schreiber specifically pointed to the increased number of automobile accidents in the road construction area after Cherry Hill had built the reverse "S" curve. Cherry Hill's Grade Foreman, Jim Rogers, its Superintendent, Steve Kitchen, and its Project and Traffic Manager, James Openshaw, testified that they were aware of the numerous accidents along the reverse "S" curve. Cherry Hill, however, maintained that the testimony of its employees did not demonstrate an awareness that the accidents were causally connected to a defect in the design of the construction area.

According to Schreiber, Cherry Hill ignored its contractual duty to "maintain pedestrian and vehicular traffic safely, adequately and continuously on all portions of existing facilities affected by [Cherry Hill's] work." Schreiber noted that Cherry Hill's construction contract specifically required that "[Cherry Hill] shall provide, erect and maintain all necessary barricades, suitable and sufficient lights, danger signals, signs and other traffic control devices and shall take all necessary precautions for the protection of the work and safety of the public." Schreiber maintained that the reason for Cherry Hill's failure to implement safety precautions was its concern about receiving a $1,000,000 bonus from the State for completing construction by August 1, 1989; if Cherry Hill failed to complete the project by the deadline, the bonus would diminish by $5,000 a day for each day the project remained uncompleted.

Cherry Hill denied this allegation, specifically stating that it had no reason to ignore safety measures, such as realigning jersey barriers, because the re-setting of the jersey barriers was a specific category of labor under the contract for which Cherry Hill was paid on a time and material basis. Cherry Hill maintained that there was no evidence to support Schreiber's allegations that it had "a financial disincentive to avoid

bringing deficiencies in design to the attention of the State because it might create a delay and . . . diminish its bonus."

At the time Schreiber was injured, she was twenty-six years old and had been promoted to the position of State Trooper First-Class. Because of her injuries, Schreiber was unable to meet the physical demands of her job and was forced to retire from the Maryland State Police force. Schreiber began career counseling immediately with Lee Mintz, a vocational rehabilitation specialist, and, shortly afterward, accepted employment as a receptionist for a forensic psychiatrist. According to Schreiber, this was the highest paying job available to someone with her education, training, experience, and physical limitations. Cherry Hill, however, asserted at trial that Schreiber did not sustain a total disability to any part of her body, that she could have obtained a higher-paying job, and that she exaggerated her wage loss.

## Discussion

### I. Fireman's Rule

█ Cherry Hill argues that Schreiber's claims are barred because, "as a matter of public policy, firemen and police officers generally cannot recover for injuries attributable to the negligence that requires their assistance." *Flowers v. Rock Creek Terrace Ltd.*, 308 Md. 432, 447, 520 A.2d 361 (1987). According to Cherry Hill, "the doctrine known as the fireman's rule generally prevents . . . police officers injured in the course of their duties from recovering tort damages from those whose negligence exposed them to injury." *Southland Corp. v. Griffith*, 332 Md. 704, 713, 633 A.2d 84 (1993).

Recently, in *Southland Corp.*, the Court of Appeals discussed in detail the principles underlying the fireman's rule. The Court explained that, "[p]rior to 1987, the rationale behind the fireman's rule focused on the status of the safety officer on the landowner's premises[,]" and that courts "generally held that fire fighters and police officers were licensees when they entered property in the performance of their duties. . . ." *Id.* at 713–14, 633 A.2d 84. In *Flowers,* howev-

er, the Court departed from the traditional application of the fireman's rule:

Instead of continuing to use a rationale based on the law of premises liability, we hold that, as a matter of public policy, firemen and police officers generally cannot recover for injuries attributable to the negligence that requires their assistance. This public policy is based on a relationship between firemen and policemen and the public that calls on these safety officers specifically to confront certain hazards on behalf of the public. A fireman or police officer may not recover if injured by the negligently created risk that was the very reason for his presence on the scene in his occupational capacity. Someone who negligently creates the need for a public safety officer will not be liable to a fireman or policeman for injuries caused by this negligence.

*Flowers, 308 Md.* at 447–48, 520 A.2d 361. The *Flowers* Court also stated that "[t]he fireman's rule does not ... bar [public safety officers] from recovering tort damages for all improper conduct." *Southland,* 332 Md. at 714, 633 A.2d 84.

In *Southland,* the Court indicated that negligent acts not protected by the fireman's rule included " 'pre-existing hidden dangers where there was knowledge of the danger and an opportunity, to warn,' " *id.* at 714, 633 A.2d 84 (quoting *Flowers,* 308 Md. at 448, 520 A.2d 361), " 'acts which occur subsequent to the safety officer's arrival on the scene and which are outside of his anticipated occupational hazards,' " *id.,* and injurious acts which occur after "the initial period of his anticipated occupational risk," or which are not reasonably foreseeable as part of that risk. *Id.* at 715, 633 A.2d 84. As support for its summary, the Court cited *Prosser and Keeton on the Law of Torts* § 61, which states that

the fireman's rule has been held only to apply when the firefighter or police officer is injured from the very danger, created by the defendant's act of negligence, that required his professional assistance and presence at the scene in the first place, and the rule will not shield a defendant from liability for independent acts of misconduct which otherwise cause the injury.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 61, at 431 (5th ed. 1984).

In the case *sub judice,* Cherry Hill maintains that Schreiber may not recover tort damages because her injuries resulted from "the negligently created risk that was the very reason for her presence on the scene in [her] occupational capacity." *Flowers,* 308 Md. at 448, 520 A.2d 361. In *Flowers,* however, the Court of Appeals recognized "that the fireman's rule does not apply when a public safety officer sustains injuries after the initial period of his anticipated occupational risk, or from perils not reasonably foreseeable as part of that risk...." *Southland Corp.,* 332 Md. at 715, 633 A.2d 84.

Schreiber visited Cherry Hill's construction site to investigate an automobile accident. During Schreiber's investigation of the accident, Benton's car caromed off a jersey barrier and struck Schreiber. Schreiber did not allege that her injuries resulted from negligence associated with the automobile accident that she had been investigating; rather, Schreiber alleged that her injuries resulted from Benton's negligent driving and Cherry Hill's negligent supervision of the road construction site. As the Court stated in *Southland,* the fireman's rule does not bar a police officer from recovering tort damages when that officer sustains injuries from perils not reasonably foreseeable as part of her occupational risk. Trooper Truitt established a safety zone by setting up a flare line and, when Schreiber was injured, she was within that safety zone. Schreiber could not have reasonably anticipated that Benton's car would come hurtling through the flare line and strike her. Benton's negligence, coupled with Cherry Hill's negligence, created an unforeseeable risk, which existed outside Schreiber's anticipated occupational hazards.

Furthermore, the application of the fireman's rule in Schreiber's case does not promote the public policy rationale upon which the rule is based. We agree with the trial court's ruling that

[Cherry Hill's negligence] is not why [Schreiber] was on the scene. That doesn't promote the public policy of encourag-

ing citizens to use safety servants, if you will, because it is good for everybody if they do. To me that doesn't promote the public policy that is represented by the fireman's rule at all. It is just a penalty for no purpose and I think [Cherry Hill's negligence] is a separate event.

As support for its argument that the fireman's rule bars Schreiber's tort claims, Cherry Hill relies on *Steelman v. Lind,* 97 Nev. 425, 634 P.2d 666 (1981), in which the Supreme Court of Nevada considered the claims of a state trooper injured by a passing vehicle while he was assisting another vehicle negligently stopped on the highway. The *Lind* court held that the trooper's claims against Lind, the driver of the negligently stopped vehicle, were barred under the fireman's rule; however, the court recognized that the trooper's claims against the driver of the passing vehicle were not barred by the fireman's rule. "[I]t is evident that if the act of negligence that causes the injury is something other than what necessitated the presence of the safety officer, then the fireman's rule does not apply." *Southland Corp.,* 332 Md. at 715, 633 A.2d 84. Similarly, in the case *sub judice,* the fireman's rule would bar Schreiber's negligence claims against the driver of the vehicle involved in the accident she was investigating prior to being struck by Benton; however, the fireman's rule would not preclude Schreiber from maintaining a negligence action against Benton or Cherry Hill.

## II.   Passive/Active Negligence

Cherry Hill asserts that the trial court erred when it failed to instruct the jury regarding "the passive-active negligence test." *Palms v. Shell Oil Co.,* 24 Md.App. 540, 546, 332 A.2d 300 (1975). According to Cherry Hill,

[o]ne of the things the jury could conclude is we negligently failed to recommend additional signage which would reduce speed limit or curve signage or whatever. The jury may conclude while that may be something that should have been done and it is a minor cause of the accident or whatever, the fact of the matter is that ... Benton on a day that was so rainy they closed a portion of the beltway was

going along at 55 miles per hour in a construction zone and could not bring her vehicle under control, that is the direct active cause of ... Schreiber's injuries.

\* \* \* \* \* \*

The result of that is that we would be entitled to common law indemnification from ... Benton under the release that [Schreiber] gave to ... Benton, that would translate in [Schreiber's] being limited to the recovery against ... Benton.

With regard to instructing the jury on the issue of passive and active negligence, the trial court ruled as follows:

In my judgment the active and passive negligence is no more than whether the negligence, at least as far as [Palms v. Shell Oil Co., 24 Md.App. 540 [332 A.2d 300] (1975) ] and the case of Bloom versus Good Humor Ice Cream that it discusses, is no more than whether the negligence, if there was negligence, was a cause of the happening of the accident or whether there was an independent supervening, if you will, cause that was the cause of the accident.

These weren't cases involving instructions to the juries where they try to decide whether one is passive and the other is active. These are cases where they claim the plaintiff should get judgment as a matter of law because as a matter of law it should be determined that there was a supervening [sic] independent act of negligence having nothing whatsoever to do with the circumstances of the negligence of another defendant in the case.

I'm refusing to give the active-passive. In my judgment under question number one on the verdict sheet as proposed, if the jury determines that the defendant in this case was negligent and that that negligence contributed to the happening of the accident, the most that the defendant can get is joint tort[-]feasor liability. By that verdict the jury would have found that the defendants [sic] negligence was not the passive negligence discussed by the appellate courts in these decisions when they are really talking about cause of an accident, not the nature of the negligence. They are

talking about whether it was the cause of the accident or whether there was an independent intervening cause which caused the accident.

In *Palms v. Shell Oil Co.*, we cited *Bloom v. Good Humor Ice Cream Co.*, 179 Md. 384, 18 A.2d 592 (1941), for its discussion on passive and active negligence:

> Variously stated, the universally accepted rule as to the proximate cause is that, unless an act, or omission of a duty, or both, are the direct and continuing causes of an injury, recovery will not be allowed. The negligent acts must continue through every event and occurrence, and itself [sic] be the natural and logical cause of the injury. It must be the natural and probable consequence of the negligent act, unbroken by any intervening agency, and where the negligence of any one person is merely passive, and potential, while the negligence of another is the moving and effective cause of the injury, the latter is the proximate cause and fixes the liability.

*Bloom*, 179 Md. at 387, 18 A.2d 592.

In *Bloom*, the Court stated that the question of proximate cause "must be determined by the peculiar facts and circumstances of the particular case." *Id.* at 388, 18 A.2d 592. The *Bloom* court held that the appellant's accident "was brought about entirely by reason of the appellant leaving the [appellee's] ice cream truck, walking behind it to a place between the truck and the east sidewalk, and the sudden appearance of the automobile." *Id.* According to the *Bloom* court, the acts of negligence attributed to the appellee had "[no] connection between the alleged negligent acts of the appellee . . ., and the injury, [which] was broken by the intervening, immediate causes, which he had no reason to anticipate, and over which he had no control." *Id.* at 389, 18 A.2d 592.

In *Palms*, the appellant was injured when she slipped and fell on a thin, sheet metal advertising sign displayed in the appellee's service station waiting room. The sign, designed to be placed inside a tire casing, was improperly set in a stand and "exhibited bare." 24 Md.App. at 542, 332 A.2d 300. The

trial judge granted appellee's motion for judgment, ruling that
the appellant's act of slipping was the proximate cause of her
injury, and the improper display of the sign was " 'not in and
of itself the proximate cause of the serious consequences.' "
*Id.* at 543, 332 A.2d 300.  We reversed the trial court's
decision and held that "[a]n instrument with exposed sharp
edges on every side made stationary and left in a stand on the
floor ... in an area open to the public by invitation, is
something more than 'passive negligence.'  It constitutes an
overt exposure of a continuing danger." *Id.* at 547, 332 A.2d
300.

█ Reviewing the case *sub judice,* we hold that the trial
court did not err when it refused to submit the issue of passive
negligence to the jury.  "An act is negligent if the actor should
realize that it is likely to affect the conduct of another or a
third person in such a manner as to create an unreasonable
risk to the other...." *Jubb v. Ford,* 221 Md. 507, 513, 157
A.2d 422 (1960).  Schreiber alleged that Cherry Hill negligent-
ly supervised the road construction site, thereby creating a
danger for motorists.  Schreiber specifically alleged that
Cherry Hill failed to construct the temporary crossover ac-
cording to approved design plans, and that the jersey barriers
were misaligned.  Unlike the driver of the ice cream truck in
*Bloom,* Cherry Hill had reason to anticipate the alleged
danger, as well as the ability to exert control over the situa-
tion.  Any defect in the design and supervision of the road
construction site "constitute[d] an overt exposure of a continu-
ing danger[,]" *Palms,* 24 Md.App. at 547, 332 A.2d 300, for
which Cherry Hill may be held responsible.

█ Cherry Hill also maintains that it did not get its "day
in court" because the trial judge declined to determine that its
claim for indemnification failed as a matter of law; however,
implicit in the trial judge's refusal to instruct the jury on
passive negligence was the trial judge's finding that Cherry
Hill was not entitled to indemnification.  The trial judge
stated that, if the jury found that Cherry Hill's negligence
caused the accident then, "the most [Cherry Hill could] get

[would be] joint tort feasor liability." Moreover, that refusal to submit the issue of passive negligence to the jury is supported by Schreiber's allegations that Cherry Hill's negligence, JMT's negligence, and Benton's negligence each "contributed directly and proximately to the injuries and damages [she] sustained."

Cherry Hill argues that the judge should have submitted the issue of passive negligence to the jury because the evidence demonstrated that Benton's negligence was "the primary, active cause of the accident, and that [Cherry Hill's] negligence was secondary to that of Benton." Cherry Hill's contention, however, ignores the evidence presented by Schreiber that Cherry Hill negligently designed, implemented and monitored the traffic control plan for the area where Schreiber's accident occurred. It was, therefore, within the jury's province to conclude, from all of the evidence, that Cherry Hill's negligence was a direct and proximate cause of Schreiber's injuries. We note that the trial court entered judgment in favor of Cherry Hill regarding its cross-claims against Benton, JMT, and EESI. Cherry Hill is entitled to contribution, not indemnification, from those cross-defendants.

### III. Admission of Disability Pension Benefits

"[T]he collateral source rule allows admission of collateral source payments only if there is a preliminary showing of malingering or exaggeration of injury...." *Swann v. Prudential Ins. Co.*, 95 Md.App. 365, 379, 620 A.2d 989 (1993), *rev'd on other grounds, Dover Elevator Co. v. Swann*, 334 Md. 231, 638 A.2d 762 (1994). "[E]vidence as to collateral payments is inadmissible in the absence of evidence of malingering or exaggeration or where the real purpose of the evidence offered as to collateral sources is the mitigation of liability for damages of the defendant." *Kelch v. Mass Transit Admin.*, 42 Md.App. 291, 296, 400 A.2d 440 (1980) (citations omitted). Schreiber asserts that, in order to mitigate damages, Cherry Hill offered evidence that, after her accident, she received disability payments. Cherry Hill asserts that Schreiber failed to preserve the collateral payments issue for appellate review,

and that, even if the issue were preserved, the evidence demonstrates that Schreiber exaggerated the impact of her injuries on her future wage earning capacity. We agree with Cherry Hill that Schreiber failed to preserve the collateral payments issue for our review. We explain.

In the case *sub judice*, Schreiber moved *in limine* to prevent Cherry Hill from introducing evidence that she received disability payments. According to Schreiber, there was no evidence that she lacked the motivation to return to work or that she exaggerated her injury, and therefore, there was no basis for the admission of evidence that she received disability payments. Cherry Hill argued, however, that the admission of Schreiber's receipt of disability benefits addressed the deposition testimony of Schreiber's vocational rehabilitation expert, who testified, "I might have pushed harder, but why should I if due to the disability benefits [Schreiber's] doing great?" Cherry Hill maintained that that statement indicated that, because she was receiving disability payments, Schreiber did not obtain the best job available for someone of her experience and education.

Initially, the trial judge ruled as follows:

I'm going to deny [Cherry Hill's] motion subject to ... if you laid a foundation that the plaintiff is malingering, I'll reconsider this.

But the fact that [the vocational rehabilitation expert] says she didn't push hard because [Schreiber] was getting the disability benefits, in my judgment that is not sufficiently relevant to outweigh the other.

After hearing more argument from both parties, however, the trial judge decided that the evidence that Schreiber received disability payments "[went] to the testimony of the expert," and that Cherry Hill could refer to Schreiber's receipt of disability payments, but could not mention the amount of those payments.

At trial, Cherry Hill cross-examined Schreiber's vocational rehabilitation expert, Lee Mintz, concerning her vocational efforts in returning Schreiber to a post-injury position "that

[would be] as close as possible in pay to what [she] was making ... before the injury." Ms. Mintz testified as follows:

A.  I would say that my concerns with the job search would be to return her to the best position that we could find for her given her physical disabilities and her experience and her background.

Q.  Well, ... when I asked you that same question in your deposition—

A.  Yes.

\*  \*  \*  \*  \*  \*

Q.  Question, "Is it fair to say then that your vocational efforts were not particularly concerned with trying to match up her pre-injury wage with her post-injury wage as close as possible?"  Your answer was, "Actually no."  My question was, "What would it be fair to say?"  Answer, "I would say with the basis of her situation where she was receiving a pension, there was not a tremendous need to return her to as high an income as if she were not."  Okay is that your answer at that time?

A.  If that is what was written, that is my answer at that time.

Cherry Hill's counsel read that testimony into the record without objection.  Schreiber's counsel objected only after Cherry Hill's counsel suggested that Schreiber informed another vocational rehabilitation expert that "she would be willing to work full-time or part-time as she receives a pension from the Maryland State Police."  The trial judge sustained that objection.  Continuing the cross-examination, Cherry Hill's counsel asked Ms. Mintz whether Schreiber explained why she would be willing to accept full-time or part-time employment.  Ms. Mintz testified, without objection, that "it [was] because she was receiving a pension from the Maryland State Police."

"In the absence of a continuing objection, specific objections to each question are necessary to preserve an issue on appeal."  *Beghtol v. Michael,* 80 Md.App. 387, 394, 564 A.2d 82 (1989), *cert. denied,* 318 Md. 514, 569 A.2d 643 (1990).  Rule 2–

517(a) provides that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." In *Beghtol,* the appellant urged us to accept a broad objection at the beginning of a witness's testimony as a continuing objection to testimony concerning speed. Recognizing that "[c]ontinuing objections have only recently become a recognized part of Maryland trial practice," *id.* at 393, 564 A.2d 82, we cited Rule 2–517(b), which provides that,

> [a]t the request of a party or on its own initiative, the court may grant a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope.

In light of Rule 2–517(b), we held as follows:

> [A]ppellant's counsel did not ask for a continuing objection, nor did the court grant one *sua sponte.* The Court of Appeals has enunciated the rule that "[i]f the trial judge admits the questionable evidence, the party who made the motion [*in limine*] ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review." Clearly, a motion *in limine* is not the equivalent of a continuing objection.... There is no equivalent to a continuing objection. Though specific objections to every question will preserve the issue for appellate review, they cannot be equated with continuing objections which were instituted precisely to avoid the interruptions of specific objections.

*Id.* at 393–94, 564 A.2d 82 (citation omitted).

In arguing that the disability payment issue was preserved, Schreiber asserts that she did not object during Cherry Hill's cross-examination of Ms. Mintz because her request that Cherry Hill not question Ms. Mintz concerning disability payments had been denied prior to trial. Schreiber cites *Mayor & City Council of Baltimore v. Smulyan,* 41 Md.App. 202, 397 A.2d 198, *cert. denied,* 285 Md. 728 (1979), to support

her argument that her failure to object during Cherry Hill's cross-examination of Ms. Mintz "was simply an indication of 'acquiescence' in the court's ruling rather than a waiver of [her] extensively argued objection." Schreiber's reliance on this case, however, is misplaced.

In *Smulyan,* the appellant requested "a 'blanket objection' to 'any mention of [a] re-use appraisal' when the subject first arose during [the witness's] testimony." *Id.* at 218, 397 A.2d 198. The appellant again made a timely objection when the appellee's counsel began questioning another witness concerning the re-use appraisal. Because the appellant's second objection was clearly a general objection that "[i]t believed that the ... appraisal was irrelevant and should not be brought into the case," we stated that

> [w]hen the court permitted cross-examination of [the second witness] to proceed ... it decided the issue raised by the [appellant's] objection; and, by failing to object to each further question or exhibit, the [appellant] was simply acquiescing in the court's ruling rather than manifesting a waiver of its twice-stated objection.

*Id.* at 218–19, 397 A.2d 198. The appellant, in *Smulyan,* objected to testimony concerning the re-use appraisal twice during the trial and we held, that

> there are some practical limits to what counsel must do, or refrain from doing, in order to preserve the objection. When a party makes a clear objection to specific evidence and that objection is plainly overruled, he is not required to play the ostrich and simply ignore the evidence, or its potential effect upon his case, for fear of losing his ground for appeal. He may cross-examine ... the witness about the evidence, and make other reasonable efforts to show that the evidence, admitted over his objection, should nevertheless be discounted or disregarded by the trier of fact.

*Id.* at 219, 397 A.2d 198 (citation omitted).

In the case *sub judice,* Schreiber did not ask for a continuing objection to the mention of disability payments when the subject first arose during Ms. Mintz's testimony.

Schreiber's counsel, however, successfully objected to Ms. Mintz's testimony concerning what Schreiber may have told another vocational rehabilitation expert concerning disability payments. Additionally, Schreiber's counsel initially objected to the admission of the vocational rehabilitation report "because [it was] reference as to insurance."

Cherry Hill indicated that the references to insurance could be redacted, and the trial court indicated that would be "no problem." Cherry Hill later moved to admit the report into evidence with the stipulation that the insurance information be redacted. Schreiber renewed her objection to the report's admission. The trial court overruled that objection and admitted the report. Also, although Schreiber objected to the admission of the report, Ms. Mintz had already testified, without objection, concerning its contents. Assuming *arguendo* that the admission of the report was error, that error was harmless.

### IV. Graduate Degree/Wage–Earning Potential

■ Schreiber also argues that the trial court erred when it permitted Cherry Hill to argue that she "should have to go back to school and obtain a master's degree to enhance her wage-earning potential and mitigate her damages." Schreiber first refers to a conversation with the trial court, outside the presence of the jury, concerning her motion *in limine* to preclude Cherry Hill from mentioning Schreiber's failure to return to graduate school to advance her education. Cherry Hill argued that Schreiber could have obtained a higher paying job had she returned to graduate school. Schreiber, however, argued that she was not required to return to graduate school in order to obtain another degree and that mentioning graduate school to the jury would "fall[ ] into the concept of mitigation." The trial court denied Schreiber's motion, ruling "I can't see how I can grant the motion because I don't know what the facts are. I don't know what [Cherry Hill's] expert is going to say, but I will consider it on the motion to strike...."

In light of the trial court's ruling, Cherry Hill cross-examined Schreiber concerning her desire to return "to school for a higher level of degree in a master's program of some sort." Schreiber's counsel objected to this question and the trial court overruled that objection. Schreiber then testified that she would consider pursuing an advanced degree if she had the available funds. In addition to Schreiber's testimony, Ms. Mintz testified that, with an advanced degree, a position in social work was available at Sheppard Pratt.

After this testimony, the trial court decided that Cherry Hill would not be allowed to elicit further testimony from witnesses concerning Schreiber's failure to obtain an advanced degree:

> Counsel, I have been thinking about this college education argument and I am of a mind that ... I should have granted ... [Schreiber's] motion in limine as to getting the master's degree. If [Cherry Hill] is intending to pursue that, I don't know whether you are or are not at this point, the reason is—the reason is it seems to me that requiring [Schreiber] to go to school for two years, if that is the proffer, expend the tuition to do that, give up the income she is earning goes beyond the requirements of a Plaintiff to mitigate damages. So I am going to reverse myself.

> \* \* \* \* \* \*

> ... I'm deciding it on the public policy that [Schreiber] doesn't have to do it. I'm happy to hear from you, well, maybe she doesn't have to do it, but it should be an alternative means of the jury considering the calculation of the damages in this case because it is reasonable that someone in her circumstances would do it.

> \* \* \* \* \* \*

> I am going to grant this motion in limine at least at this point to testimony related to [Schreiber's] should have— should seek her master's in order to go on to [a] social worker job.

> \* \* \* \* \* \*

... I set a landmine for myself. I'm not trying to set a landmine for people. I have been thinking about this as it has been going on and I'm just not satisfied with my initial ruling upon it for the reasons I made personally clear on this record, I believe.

In *Atholwood Development Co. v. Houston*, 179 Md. 441, 19 A.2d 706 (1941), the Court of Appeals indicated that the measure of damages for wrongful discharge should take into consideration "the exercise of reasonable diligence in seeking other employment in the same or similar business." *Id.* at 446, 19 A.2d 706. The Court further stated that "[w]hat constitutes reasonable diligence is a question of fact depending upon the circumstances of each particular case." *Id.*

In the case *sub judice*, the trial court, reversing its ruling on Schreiber's motion *in limine*, stated that "requiring [Schreiber] to go to school for two years, ... expend the tuition to do that, give up the income she is earning goes beyond the requirements of a Plaintiff to mitigate damages." *See Wartzman v. Hightower Prods., Ltd.*, 53 Md.App. 656, 456 A.2d 82, *cert. denied*, 296 Md. 112 (1983) (holding that there is no duty to spend large sums of money or incur substantial additional expense in order to mitigate damages). Although Schreiber was not wrongfully discharged, her measure of damages with regard to lost wages/earning capacity logically should take into consideration her exercise of reasonable diligence in attempting to secure other employment. We agree with the trial court's determination that, as a matter of fact, it would exceed reasonable diligence to require Schreiber to obtain an advance degree in order to mitigate her economic damages.

The problem, however, is that, prior to the trial court's decision to grant Schreiber's motion *in limine*, the jury had already heard Schreiber testify on cross-examination that, if she had sufficient funds to afford the tuition for a master's program, she would consider enrolling in a post-graduate program to enhance her income-earning capacity. The jury also heard Ms. Mintz testify concerning graduate programs

and salaries offered those with graduate degrees. Although the trial court reversed its decision permitting Cherry Hill to allude to Schreiber's failure to obtain a graduate degree, the record indicates that the trial court failed to advise the jury to disregard that evidence in its calculation of Schreiber's damages. We recognize that "[t]rial courts have the widest discretion in the conduct of trials and such discretion should not be disturbed on appeal in the absence of clear abuse." *Market Tavern, Inc. v. Bowen*, 92 Md.App. 622, 647, 610 A.2d 295 (1992). In the case *sub judice*, the trial court erred when it admitted, over Schreiber's objection, testimony concerning post-graduate education. The trial court later acknowledged its error and reversed its prior decision to deny Schreiber's motion *in limine*. Although the trial court attempted to limit the damage by prohibiting the admission of further testimony concerning post-graduate education, that attempt was insufficient. We cannot conclude with certainty that Cherry Hill's references to Schreiber's failure to obtain a graduate degree did not influence the jury in arriving at its award of $100,000 for lost wages/earning capacity. Therefore, we reverse that part of the jury's award.

### V. Testimony of Cherry Hill's Vocational Rehabilitation Expert

Schreiber also contends that the jury's award with regard to lost wages/earning capacity was improperly influenced by the testimony of Cherry Hill's rehabilitation expert, Steven Shedlin. Mr. Shedlin was received, without objection, by the court as an expert in the field of rehabilitation, and testified, without objection, concerning areas of employment that Schreiber "could engage in using her existing transferable skills which would afford her a better position." According to Mr. Shedlin, Schreiber could have worked as a security supervisor

> in a setting being such as a department store or university or industry where they have certain security needs and they would be relying upon sort of an in-house consultant to set up what it is that they need in order to make sure the

security is secure and [to supervise] individuals that are providing that security.

When Mr. Shedlin attempted to testify about his findings "as to the average salaries for security personnel in the type of position that [he] had in mind for ... Schreiber," however, Schreiber's counsel objected. The following ensued:

[SCHREIBER'S COUNSEL]: Your Honor, How in the world can this witness testify as to what the average salaries are for the kind of security position he has in mind when he just testified that that is simply the average salary for all security positions?

[CHERRY HILL'S COUNSEL]: I can say a supervisor and make it more specific if that is her concern.

[SCHREIBER'S COUNSEL]: That's a survey of all security positions with absolutely no differentiation as to the type.

THE COURT: Alright. I'll sustain it unless you clarify what he means by what the survey is and how it makes the kind of security position that he has testified at least would be appropriate for this client.

Mr. Shedlin then testified that, in the Baltimore area, the median salary for a security supervisor was "$11.25 per hour, about $450.00 per week." On cross-examination, Mr. Shedlin conceded that he had not contacted any employers on Schreiber's behalf, and that he did not know of any prospective employers who would be able to offer Schreiber a security supervisor position. Mr. Shedlin further conceded that he did not know of any specific position that Schreiber would be qualified for in terms of her specific physical limitations, because "that takes a two to three month job search contacting people and networking in order to find that type of work." Although Mr. Shedlin was unfamiliar with the physical requirements for a security supervisor position in today's job market, he testified that, unless the physical requirements had changed in the last four years, he was of the opinion that "[such positions] do not by and large have requirements that somebody be involved physically."

Schreiber moved to have Mr. Shedlin's testimony stricken on the ground that he was "simply speculating on the basis of his training, experience and education that a [security supervisor] job . . . exists out there somewhere." As support for her position, Schreiber cited *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 625 A.2d 1005 (1993), in which the Court of Appeals held that "an expert's reliance on hearsay statements of others is not ordinarily an adequate basis upon which to predicate the expert's opinion." *Id.* at 741–42, 625 A.2d 1005.

Schreiber's motion to strike Mr. Shedlin's testimony, however, was not made at the time Mr. Shedlin testified concerning Schreiber's suitability for employment as a security supervisor. In *Baltimore & Ohio Railroad Co. v. Plews,* 262 Md. 442, 278 A.2d 287 (1971), the appellant "[was] deemed to have consented to the introduction of . . . testimony and [its] subsequent motion to strike [was properly] denied by the trial court because it neither objected at the time the question was asked nor did it move to strike immediately after the answer." *Id.* at 470, 278 A.2d 287. Similarly, in *Collier v. Eagle–Picher Industries, Inc.,* 86 Md.App. 38, 585 A.2d 256, *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991), we declined to address the cross-appellant's argument that the trial court improperly denied its motion to strike the testimony of the cross-appellee's witness because the motion to strike, made ten trial days after the completion of the witness's testimony, was not timely. We stated that "Md.Rule 2–517(a) requires that an objection to the admission of evidence 'be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent.'" *Id.* at 62, 585 A.2d 256. In *Collier,* "[n]o objection was made to [the witness's] testimony when it was given; nor, despite his response on cross-examination was any contemporaneous motion made to strike it." *Id.*

During Mr. Shedlin's testimony, Schreiber's counsel objected to a question concerning the average salary for a security supervisor position. The trial court sustained the objection "unless [Cherry Hill's counsel] clarif[ied] . . . what the [Labor Market] Survey is and how it makes the kind of security [supervisor] position . . . appropriate for [Schreiber]."

Schreiber's counsel also objected to a question concerning salaries for security supervisor positions in the Washington, D.C. area. The trial court overruled that objection.

Three days later, Schreiber's counsel moved to strike Mr. Shedlin's testimony. Schreiber's counsel argued that Mr. Shedlin's testimony that Schreiber "could be a security supervisor somewhere in the state of Maryland at the salary of $25,000.00" was not based on "hard data," and therefore, Cherry Hill could not use that testimony to argue to the jury that Schreiber could have obtained a better-paying job. The motion to strike was not made contemporaneously with the objections, and the motion to strike did not relate back to either of the objections Schreiber's counsel made during Mr. Shedlin's testimony. Accordingly, we hold that Schreiber's "complaint [on this issue] is not properly before us." *Collier*, 86 Md.App. at 62, 585 A.2d 256.

## VI. Punitive Damages

At the close of Schreiber's case, the trial court granted Cherry Hill's motion to dismiss Schreiber's punitive damage claim. The trial court ruled:

The court has given a lot of thought to this. I have reread the cases and I have considered the testimony and the argument of counsel. The only reason that I in any way let this issue of punitive damages even reach this point was because of the language of Judge Rodowsky in the *Komorni*[*k, infra*] case where he engages in discussion treating the driver in that case as a [sic] instrument in likening the circumstances to a products liability case.

However, in my judgment there is insufficient evidence to get the issue of punitive damages before this jury. Actual knowledge of the defect, quite frankly there is no actual knowledge of the defect shown in this case in my judgment. What has been shown is that the road and crossover as constructed were not constructed in accordance with the Greiner Plan, but that doesn't make them defective. That makes them not in accordance with the Greiner Plan and it was not approved by the State Highway Administration.

This is the evidence in the light most favorable to the plaintiff in my judgment.

However, the plaintiff's expert witness testified that site constraints were such as to require that road to be built that way and it is not defective. It can be built that way, but then other precautions must be taken. In connection with the other precautions that must be taken, that is the reduction of speed and the placement of signs and the maintenance of the proper alignment of the barriers, in my judgment there is woefully inadequate evidence to support a conscious or deliberate disregard of harm or actual knowledge of the defendant that these measures were necessary in order to prevent harm.

Now, I say that because there is no testimony that the defendants knew that the radius of 135 feet required the safety measures which have been testified to. I will accept that they are the appropriate measures that should have been taken, but where there is no testimony that the defendants in this case were aware, number one, really of the radius, although they built it and they should be aware of it; number two, of the safety measures that were called for as a result of that radius being the end-product of their construction.

As I say, that may be negligence, it may be gross negligence, but in my judgment that is not enough to—when I say that may be, I'm talking about the failure to take the necessary safety precautions as testified to by plaintiff's expert in order to ameliorate the 135 degree radius and the superelevation that was put in place by the defendants. Gross and wanton negligence isn't enough to support punitive damages under the law as I understand it to be.

In addition, the notice. Counsel has argued a number of times that the defendant can't stick their head in the sand and I agree with that, but when it comes to negligence, and I might agree with it with regard to punitive damages, but there is no testimony that the number of accidents that occurred at this site were such as to be so outrageously disproportionate with accidents that occur at other construc-

tion sites that in the experience in the industry that someone should be aware that you should investigate. There is no testimony that the defendants had any actual knowledge of the fact that the accidents were caused as a result of the road construction and/or the failure of safety measures. The arguments are that they should have known that, but there isn't any testimony that they did, nor is there any testimony that I can recall that there was a disproportionate amount of accidents at this particular construction site as compared to other construction sites. That's a minor consideration in my overall evaluation of this, but it is a consideration that the court has taken into account.

As I say, the failure to check the barriers and a request of the reduction of the speed may have been negligent, but in my judgment it is not sufficient to meet the standard requirement to get this issue before the jury as to punitive damages. As a result, the motion for judgment as to punitive damages is going to be granted.

■ In *Komornik v. Sparks,* 331 Md. 720, 629 A.2d 721 (1993), the Court emphasized that, based on its holding in *Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), the punitive damages standard for non-intentional torts requires " 'actual knowledge of the defect and deliberate disregard of the consequences.' " *Komornik,* 331 Md. at 726, 629 A.2d 721 (quoting *Zenobia,* 325 Md. at 462, 601 A.2d 633). "[B]y 'actual knowledge,' [the Court] did not mean constructive knowledge, and . . ., by 'conscious or deliberate disregard,' [the Court] did not mean 'negligence alone, no matter how gross, wanton, or outrageous.' " *Id.* (quoting *Zenobia,* 325 Md. at 463, 601 A.2d 633).

Additionally, in *United States Gypsum Co. v. Mayor & City Council of Baltimore,* 336 Md. 145, 647 A.2d 405 (1994), the Court reiterated that "to recover punitive damages in *any* tort action, the plaintiff must establish the requisite malice by clear and convincing evidence." *Id.* at 188, 647 A.2d 405 (emphasis added). Therefore, to recover on her punitive damages claim, Schreiber was required to prove that Cherry Hill actually

knew, during the relevant time period, that its design and maintenance of the construction site presented a serious risk to motorists. *See id.* (stating that to recover punitive damages, the City had to show that Asbestospray "actually knew, during the relevant time period, that its asbestos-containing fireproofing presented a serious health risk to ordinary building users"). Schreiber was further required to demonstrate that, despite this knowledge, Cherry Hill, in bad faith, ignored the defective condition of the construction site, purposely doing nothing to protect motorists from the dangers posed by the known defects. *See id.* at 189, 647 A.2d 405 (stating that *Owens–Illinois v. Zenobia, supra,* also required the City to show that, armed with the knowledge that its asbestos-containing fireproofing posed a danger to building users, "Asbestospray proceeded to market its fireproofing product in bad faith").

In the case *sub judice,* the trial court found, and explained in detail, that the evidence was insufficient to support Schreiber's claim for punitive damages. Consequently, the trial court granted Cherry Hill's motion for judgment. When a defendant moves for judgment at the close of plaintiff's evidence, the court must consider all evidence and inferences in the light most favorable to the plaintiff. *Higgins v. City of Rockville,* 86 Md.App. 670, 687, 587 A.2d 1168, *cert. denied,* 323 Md. 309, 593 A.2d 669 (1991). The trial court specifically found that the evidence presented by Schreiber was "woefully inadequate" to demonstrate that Cherry Hill had actual knowledge of a defect in the construction site and deliberately disregarded the consequences of that defect. We find no error.

## VII. Liability of JMT and EESI

At the close of all the evidence, Schreiber's counsel moved for judgment on the issue of JMT's and EESI's negligence. Specifically, Schreiber's counsel argued that

> there [was] absolutely no evidence that either [JMT or EESI] inspectors were present when th[e] crossover was

built or involved in any way in inspection duties in that area. There has also been absolutely no evidence that either one of the firms or employees had any duty to see to it that this curve was constructed properly or safe for traffic. There has been absolutely no testimony introduced or evidence introduced by [Cherry Hill] on the issue of whether th[ose] inspectors even should have been looking at the geometrics of the roadway or whether th[ose] were safe for traffic conditions.

The court denied the motion:

As for the motion for [judgment] ... on behalf of JMT and [EESI], it is denied. In my judgment there is evidence that they were performing some of the same functions as the state was performing and they were generally out there. I think it is argument for the jury that there is nothing specific as to those two particular entities and/or their employees, but the jury could ... conclude from the evidence that they were doing the same kind of inspection things that the state was doing and had the same responsibility to be looking out for problems as the state was doing and that their failure to do so was partly a contributing cause as to the happening of the accident.

Sufficient evidence did exist to send the issue of JMT's and EESI's negligence to the jury. At trial, several State Highway Administration employees testified that JMT and EESI were employed to inspect and monitor the work performed by Cherry Hill, and that JMT and EESI had the authority to request changes in posted speed limits for the construction site area. Furthermore, Ramisch testified that the functions of JMT and EESI were "basically to provide contract inspection for the State," and that JMT and EESI "should have caught" Cherry Hill's deviations from the Greiner design plans. Mr. Ramisch further testified that the SHA, JMT, and EESI had a duty to note whether the jersey barriers used at the construction site area were misaligned.

When determining whether there is sufficient evidence to submit an issue to the jury, the trial court views the

evidence and all inferences fairly deducible therefrom, in a light most favorable to the party opposing the motion. *Impala Platinum Ltd. v. Impala Sales,* 283 Md. 296, 327, 389 A.2d 887 (1978). If there is any competent evidence, however slight, legally sufficient as tending to prove negligence, the weight and value of such evidence should be left to the jury. *Beahm v. Shortall,* 279 Md. 321, 324, 368 A.2d 1005 (1977).

In the case *sub judice,* we hold that the testimony of the SHA employees, coupled with the testimony of Schreiber's expert witness, Mr. Ramisch, provided legally sufficient evidence that tended to prove negligence on the part of JMT and EESI. The trial court, therefore, properly permitted the jury to evaluate the weight and credibility of that evidence.

**JUDGMENT REVERSED AS TO THE AWARD OF DAMAGES FOR LOST WAGES/EARNING CAPACITY. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW TRIAL ON THE ISSUE OF THOSE DAMAGES ONLY. JUDGMENT OTHERWISE AFFIRMED. COSTS TO BE PAID 60% BY APPELLEE, 40% BY APPELLANT.**